# In the United States Court of Federal Claims

|  |  |
|---|---|
| SH SYNERGY, LLC and<br>VCH PARTNERS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | Nos. 22-cv-1466, 22-cv-1468<br>(consolidated)<br><br>Filed Under Seal: April 21, 2023<br><br>Publication: April 28, 2023[1] |

*John D. Levin*, Maynard, Cooper & Gale, P.C., Huntsville, AL for Plaintiffs.  With him on the briefs were *W. Brad English*, *Emily J. Chancey*, *Joshua B. Duvall*, and *Nicholas P. Greer*, all from Maynard, Cooper & Gale, P.C., Huntsville, AL.

*John H. Roberson*, Senior Trial Counsel, United States Department of Justice, Civil Division, Washington, D.C. for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Washington, D.C.; *Patricia M. McCarthy*, Director, United States Department of Justice, Civil Division, Washington, D.C.; *Douglas K. Mickle*, Assistant Director, United States Department of Justice, Civil Division, Washington, D.C.; *Barbara Behn Ayala*, Assistant General Counsel, U.S. General Services Administration, Washington, D.C.; *Carmody Gaba Daman*, Assistant General Counsel, U.S. General Services Administration, Washington, D.C.; *Michael Blumenthal*, Trial Attorney, U.S. Small Business Administration, Office of General Counsel, Washington, D.C.

## MEMORANDUM AND ORDER

Plaintiffs SH Synergy, LLC (SHS) and VCH Partners, LLC (VCH) (collectively, Plaintiffs)

filed this pre-award bid protest to contest the General Service Administration's (GSA's) $60 to

$100 billion small business set-aside government-wide acquisition contract (GWAC) for

information technology (IT) services known as the "Polaris Program."  Plaintiff SH Synergy,

---

[1] This Memorandum and Order was filed under seal in accordance with the Amended Protective Order entered in this case (ECF No. 22) and was publicly reissued after incorporating all appropriate redactions proposed by the parties (ECF No. 44-1).  The sealed and public versions of this Memorandum and Order are otherwise substantively identical, except for the publication date, the correction of minor typographical errors, and this footnote.

LLC's Motion for Judgment on the Administrative Record and Incorporated Brief (ECF No. 34) (SHS MJAR) at 9; Plaintiff VCH Partners, LLC's Motion for Judgment on the Administrative Record and Incorporated Brief (ECF No. 33) (VCH MJAR) at 9; AR at 2826.[2]   The protest challenges the legality of three solicitations under the Polaris Program: the Small Business (SB) Pool Solicitation; the Women-Owned Small Business (WOSB) Pool Solicitation; and the Service-Disabled Veteran-Owned Small Business (SDVOSB) Pool Solicitation (collectively, the Solicitations or the Polaris Solicitations).  SHS MJAR at 9; VCH MJAR at 9.  Plaintiffs allege that certain Solicitation requirements violate federal procurement statutes and agency regulations governing procurements involving small business offerors.  *See generally* SHS MJAR at 14; VCH MJAR at 14.

Having considered the parties' arguments, applicable law, and the Administrative Record, this Court **GRANTS in part and DENIES in part** Plaintiffs' Motions for Judgment on the Administrative Record (ECF Nos. 33, 34) and **GRANTS in part and DENIES in part** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 37).   As described more fully below, Defendant is **ENJOINED** from evaluating proposals and awarding IDIQ contracts under the current versions of the SB, WOSB, and SDVOSB Pool Solicitations.  Should Defendant opt to proceed with the procurement, it must amend the SB, WOSB, and SDVOSB Pool Solicitations, and evaluate proposals submitted under those Solicitations, consistent with and in compliance with this Memorandum and Order.

---

[2] Citations throughout this Memorandum and Order to the Administrative Record correspond to the pagination within that document.  Citations to all other documents, including briefing and exhibits, reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

## **BACKGROUND**

### I.      **The Parties**

SHS and VCH are IT service providers and mentor-protégé joint ventures (JVs) formed under the Small Business Association's (SBA's) Mentor-Protégé Program.  *See generally* SHS Amended Complaint (ECF No. 25) (SHS Compl.); SHS MJAR; VCH Amended Complaint (ECF No. 26) (VCH Compl.); VCH MJAR.  SHS qualifies as a women-owned small business and is an actual offeror on the WOSB Pool Solicitation under the Polaris Program.  SHS Compl. ¶¶ 2, 5.  VCH qualifies as a service-disabled veteran-owned small business and is an actual offeror on the SDVOSB Pool Solicitation under the Polaris Program.  VCH Compl. ¶¶ 2, 5.  Both SHS and VCH also claim to be prospective offerors on the SB Pool Solicitation.  SHS Compl. ¶ 5; VCH Compl. ¶ 5.  Both SHS and VCH state they have prepared, but not yet formally submitted, proposals in response to the SB Pool Solicitation.  SHS Compl. at 2 n.1; VCH Compl. at 2 n.1.  Plaintiffs allege that GSA has prohibited them from proposing on the SB Pool Solicitation "[b]ecause Plaintiffs' mentor member is already submitting a proposal through another SBA-approved protégé joint venture, [and] the SB Solicitation prohibits" mentor-protégé JVs with the same mentor from bidding on a single Solicitation.  SHS MJAR at 20; VCH MJAR 20; SHS Compl. ¶¶ 37–38; VCH Compl. ¶¶ 38–39.

GSA is a federal government agency charged with centralized procurement services for the Federal Government, focusing primarily on real estate and technology services.[3]  GSA, in conjunction with the Department of Defense and NASA, issues government-wide regulations for federal procurements under the Federal Acquisition Regulation (FAR), which is "the primary

---

[3] *Mission and Background*, U.S. General Services Administration, https://www.gsa.gov/about-us/mission-and-background (last visited Apr. 19, 2023).

regulation for use by all executive agencies in their acquisition of supplies and services with appropriated funds."[4]

## II.    SBA Mentor-Protégé Program

Through the SBA's Mentor-Protégé Program, small businesses with limited industry experience (protégés) partner with experienced government contractors (mentors) to compete for federal procurement contracts.[5]   The Mentor-Protégé Program "is designed to enhance the capabilities of protégé firms by requiring approved mentors to provide business development assistance to protégé firms and to improve the protégé firms' ability to successfully compete for federal contracts."  13 C.F.R. § 125.9(a).  SBA regulations establish the criteria firms must meet to qualify as either a protégé or mentor under the Mentor-Protégé Program.  *See* 13 C.F.R. § 125.9(c)(1) (outlining the qualifications for protégés); 13 C.F.R. § 125.9(b)(1)–(2) (outlining the qualifications for mentors).  Importantly, firms need not individually qualify as small businesses to serve as mentors in the program.  *See* 13 C.F.R. § 125.9(b) ("Any concern that demonstrates a commitment and the ability to assist small business concerns may act as a mentor and receive benefits as set forth in this section.  This includes other than small businesses.").  All mentor-protégé relationships are vetted and approved by the SBA upon formation, and a mentor may only have up to three protégés at one time.  *See* 13 C.F.R. § 125.9(b)(3)(ii).  However, for the SBA to approve a second or third mentor-protégé relationship, "the mentor and proposed additional

---

[4]   *Federal Acquisition Regulation (FAR),* U.S. General Services Administration, https://www.gsa.gov/policy-regulations/regulations/federal-acquisition-regulation-far (last visited Apr. 19, 2023) ("The Department of Defense (DoD), GSA, and the National Aeronautics and Space Administration (NASA) jointly issue the FAR.").

[5]   *SBA Mentor-Protégé Program*, Small Business Administration, https://www.sba.gov/federal-contracting/contracting-assistance-programs/sba-mentor-protege-program (last visited Apr. 19, 2023).

protégé must demonstrate that the added mentor-protégé relationship will not adversely affect the development of either protégé firm (e.g., the second firm may not be a competitor of the first firm)."  13 C.F.R. § 125.9(b)(3).

By allowing mentor firms to assist proteges with "the performance of contracts set aside or reserved for small business," the Mentor-Protégé Program constitutes an exception to the SBA's standard rules governing affiliation between firms.  13 C.F.R. § 125.9(a); *see* 13 C.F.R. § 121.103 (defining "affiliation" and carving out exceptions to affiliation, including § 121.103(b)(6), which reiterates the exception for mentor-protégé relationships).  Traditionally, firms can lose their small business status by affiliating with larger companies.  *See* FAR 52.219-6(a) (noting that whether an entity qualifies as a "small business concern" for set-aside procurements depends on the combined size of the entity itself and any of the entity's affiliates); 13 C.F.R. § 121.103 (defining the circumstances that create affiliation between two firms).  Through the Mentor-Protégé Program, however, "[a] protégé and mentor may joint venture as a small business for any government prime contract, subcontract or sale, provided the protégé qualifies as small for the procurement or sale." 13 C.F.R. § 125.9(d)(1).  "Such a joint venture may seek any type of small business contract (i.e., small business set-aside, 8(a), HUBZone, SDVO, or WOSB) for which the protégé firm qualifies . . . ."  *Id.*  Thus, the size and nature of the protégé firm, rather than the mentor firm, dictate the specific procurements for which a mentor-protégé team can bid.  *See* 13 C.F.R. § 125.9(d). Importantly here, though a mentor may have more than one protégé, it cannot bid on the same Solicitation multiple times using different protégé relationships.  *See* 13 C.F.R. § 125.9(b)(3)(i). Specifically, the law dictates that "[a] mentor that has more than one protégé cannot submit competing offers in response to a solicitation for a specific procurement through separate joint ventures with different proteges."  13 C.F.R. § 125.9(b)(3)(i).

### III.     The Polaris Program

The Polaris Program is a small business set-aside procurement designed to deliver "customized [IT] services and IT services-based solutions" to qualifying federal agencies. Administrative Record (ECF Nos. 30, 32) (AR) at 1024, 2063, 2553.  GSA estimates that procurements for IT services under the Polaris Program will total approximately $6 billion per year and between $60 billion to $100 billion over the lifetime of the program.  AR at 2826.  Under the Polaris Program, GSA issued multiple Solicitations designed to form groups, or "pools," of approved, small business IT service-providers.  AR at 1024, 2063, 2553.  GSA intends to form these pools by awarding multiple-award indefinite-delivery, indefinite-quantity (IDIQ) contracts to a pre-determined number of awardees who meet the small business qualifications outlined within each Solicitation (i.e., SB, WOSB, SDVOSB, etc.).  AR at 1112–14, 2152–54, 2643–45. These IDIQ contracts will be for a term of five years, with a five-year option to extend the cumulative term of the contract to ten years.  AR at 1039, 2078, 2568.

Once the pools of eligible IT service providers are formed under each Solicitation, authorized federal agencies interested in procuring IT services may issue individual task orders upon which the IDIQ contract awardees may bid.  AR at 1024, 2063, 2553.  Accordingly, the specific IT services required by an agency are contracted for and performed at the task order level rather than at the IDIQ level under the Solicitations.  In this manner, the IDIQ contract serves as a "contract vehicle" connecting qualified small business IT providers and federal agencies through the individual task orders.  *See* Defendant's Response to Plaintiffs' MJARs and Cross-Motion for Judgment on the Administrative Record (ECF No. 37) (Cross-MJAR) at 13–14.  The Solicitations permit agencies to issue various forms of task order contracts, including fixed-price, cost-reimbursement, incentive, time-and-materials, and labor-hour contracts.  AR at 1025, 2064, 2554.

However, the Solicitations state a preference for "Firm-Fixed Price Performance-Based Task Order[s]." *Id.*

As noted, Plaintiffs' protest implicates three solicitations[6] under the program: the SB Pool Solicitation (47QTCB22R0001), AR at 1021–1144; the WOSB Pool Solicitation (47QTCB22R003), AR at 2060–2184; and the SDVOSB Pool Solicitation (47QTCB22R0007), AR at 2550–2674. *See* SHS MJAR at 9; VCH MJAR at 9; Cross-MJAR at 13.[7]  GSA intends to award 100 IDIQ contracts under the SB Pool Solicitation, 80 IDIQ contracts under the WOSB Pool Solicitation, and 70 IDIQ contracts under the SDVOSB Pool Solicitation. *See* AR at 1112–14, 2152–54, 2643–45.  Thus, each pool will consist of between 70 and 100 successful offerors.

### A.  Eligible Offerors Under the Polaris Solicitations

Since the Polaris Solicitations are for small business set-aside procurements, competition for award under the Solicitations is limited to offerors who qualify as SBs, WOSBs, or SDVOSBs under SBA regulations.   AR at 3, 1162, 2201; *see* FAR 52.219-6 (noting set-asides are procurements for which "[o]ffers are solicited only from small business concerns. . . . [and] [a]ny

---

[6] GSA prepared the Solicitations through an iterative process during which GSA published initial versions of the Solicitations and issued amendments modifying the Solicitations' terms to respond to industry feedback or other pre-award protests.  In total, GSA issued eight versions of the SB and WOSB Solicitations and three versions of the SDVOSB Solicitation. *See generally* AR at 11–2683 (documenting every version of each Solicitation issued).  The SDVOSB Solicitation received fewer amendments because GSA first issued the SDVOSB Solicitation on September 15, 2022, after it had initially issued the SB and WOSB Solicitations on March 25, 2022. *Compare* AR at 11, 1171, *with* AR at 2202.  Accordingly, earlier amendments to the SB and WOSB Solicitations were preemptively incorporated into the initial version of the SDVOSB Solicitation. *See* AR at 2202–2359.  GSA issued the final amended versions of the SB and WOSB Solicitations on September 20, 2022, and issued the final amended SDVOSB Solicitation on October 20, 2022. *See* AR at 1021, 2060, 2550.

[7] The fourth Solicitation under the Polaris Program, reserved for HUBZone offerors, is not at issue in this protest. *See, e.g.*, Cross-MJAR at 10 n.2 ("The HUBZone solicitation has not been challenged.").

award resulting from [the] solicitation will be made to a small business concern."). The Solicitations allow SB, WOSB, and SDVOSB offerors to prepare proposals using two different kinds of small business teaming arrangements: (1) prime contractor/subcontractor teaming arrangements, and (2) joint ventures. *See* AR at 1088, 2127, 2618. In a prime contractor/subcontractor teaming arrangement, "[a] potential prime contractor agrees with one or more other companies to have them act as its subcontractors" for contracts and task orders issued under the Solicitation. AR at 1088, 2127, 2618; *see* FAR 52.207-6 (defining "Small Business Teaming Arrangement" to include when "[a] small business offeror agrees with one or more other small business concerns to have them act as its subcontractors under a specified Government contract"); AR at 1083, 2122, 2613 (incorporating FAR 52.207-6 by reference in the Solicitations). Alternatively, SB, WOSB, and SDVOSB companies can submit proposals by forming joint venture entities that serve as offerors under the Solicitation. *See* AR at 1088–89, 2127–28, 2618–19. This umbrella of offerors includes mentor-protégé JVs, which may also submit proposals as offerors under the Polaris Solicitations. *See* AR at 1088–89, 2127–28, 2618–19. Joint venture entities may likewise serve as prime contractors and team with subcontractors to submit proposals under the Polaris Solicitations. *See* AR at 1088–89, 2127–28, 2618–19.

Generally, "[a] small business concern may participate under multiple proposals (e.g., Offeror, proposed subcontractor, joint venture member)." AR at 1084, 2123, 2614. This includes mentor-protégé JVs, as "nothing in the [Solicitations] prohibits a Mentor-Protégé Joint Venture from submitting a proposal against a solicitation and also participating in the same procurement as a subcontractor for another Prime offeror." Cross-MJAR at 35. Additionally, nothing in the Solicitations "bars a Mentor, that is a small business and fits within an appropriate set-aside category (e.g., SB, WOSB, SDVOSB) from submitting a proposal that competes directly with a

Mentor Protégé Joint Venture in which it is the Mentor." *Id.*  However, mentor-protégé JVs that share the same mentor may not submit competing proposals under the same Solicitation. *See* Small Business Pool Question and Response Document #4, Question 292 (AR at 890) (citing 13 C.F.R. § 125.9(b)(3)(i)).  Thus, the Solicitations prohibit mentor-protégé JVs that share a mentor from being members of the same pool of eligible providers.

> ### B.   Evaluation of Proposals – Highest Technically Rated Qualifying (HTRQ) Offerors

Under the Polaris Solicitations, GSA will award IDIQ contracts to the highest technically rated qualifying (HTRQ) offerors. *See* AR at 1112, 2152, 2643; *see also* Acquisition Plan for Polaris GWAC Program (AR at 2856) ("For Polaris, the best value basis for awards will be determined by the Highest Technically Rated Qualifying Offerors.").  The evaluation process begins with qualifying offerors (i.e., SBs, WOSBs, and SDVOSBs) submitting self-scored proposals using a points scheme derived from scoring tables contained in the Solicitations.  AR at 1113, 2153, 2644.  Offerors earn points based on how well their proposals meet the Solicitations' four primary "evaluation factors": (1) Relevant Experience; (2) Past Performance; (3) Systems, Certifications, and Clearances; and (4) Risk Assessment. *See* AR at 1114–18, 2154–58, 2645–49.  Offerors can claim a maximum of 95,000 points for their proposals.  AR at 1118, 2158, 2649.  Additionally, GSA will separately assess each offeror's Responsibility, evaluated on a pass/fail basis.  AR at 1118, 2158, 2649.

Once GSA receives all offerors' proposals, the agency will "rank the proposals in order from highest total claimed score to lowest total claimed score."  AR at 1113–14, 2153–54, 2644–45.  The 100 proposals (or 80 proposals for the WOSB Solicitation, or 70 proposals for the SDVOSB Solicitation) with the highest claimed score are called Preliminary Qualifying Proposals (PQPs).  AR at 1113, 2153, 2644.  GSA verifies the PQPs' claimed scores by reviewing all

9

supporting documentation submitted by offerors and performing an Acceptability Review[8] over the proposals. AR at 1113–14, 2153–54, 2644–45. If any PQP is eliminated from consideration after these review processes, the next highest rated proposal (based on the offeror's claimed score) will replace the eliminated proposal as a PQP. AR at 1113–14, 2153–54, 2644–45. In other words, the entire list of remaining PQPs shifts up one position.

Once GSA has verified, through the evaluation and validation process, the point totals claimed by the 100/80/70 highest-scoring offerors, GSA will cease evaluations and award IDIQ contracts to the successful, verified bidders. AR at 1114, 2154, 2645. If, after the evaluation process has concluded, multiple offerors have identical scores in the pool's final position (position 100, 80, or 70, depending on the Solicitation), all offerors tied for the pool's last spot will receive an award. AR at 1112, 2152, 2643. Thus, if this narrow circumstance occurs, more than 100/80/70 offerors can receive IDIQ contracts under the Solicitations. AR at 1112, 2152, 2643.[9]

### i.    Evaluation Criteria - Relevant Experience

Plaintiffs' protest places particular scrutiny on the Solicitations' treatment of the Relevant Experience evaluation factor. *See generally* SHS MJAR at 26–32; VCH MJAR at 26–32; Plaintiffs SHS's and VCH's Consolidated Reply in Support of Plaintiffs' MJARs and Response to Defendant's Cross-MJAR (ECF No. 38) (Pl. Reply) at 13–21. The Relevant Experience evaluation

---

[8] Through the Acceptability Review, GSA ensures that each offeror's "proposal submission information meets the criteria for the information requested in [the Solicitation] and is current, accurate, and complete." AR at 1114, 2154, 2645.

[9] The Solicitations emphasize the rule for ties only applies to the final position within a pool (i.e., spot 100, 80, or 70, depending on the Solicitation), and not to ties at any other rank. AR at 1112, 2152, 2643. Thus, if ties occur at any other rank in the pool, the tie does not result in two or more offerors holding that same numbered position. AR at 1112, 2152, 2643. For example, if two offerors receive identical verified scores at position 10, one offeror will take the 10th position, and the other offeror will move down to the 11th position. AR at 1112, 2152, 2643.

factor is divided into two sub-categories: Primary Relevant Experience Projects and Emerging Technology Relevant Experience Projects.  AR at 1093–1103, 2132–42, 2623–34.  Primary Relevant Experience Projects equal or exceed $250,000 in contract value and involve one of the following services: (1) Data Processing, Hosting, and Related Services; (2) Custom Computer Programming Services; (3) Computer Systems Design Services; (4) Computer Facilities Management Services; or (5) Other Computer Related Services.  AR at 1095–96, 2134–35, 2625–26.  All offerors must submit a minimum of three and maximum of five Primary Relevant Experience Projects as part of their proposals.  *See* AR at 1094, 2133, 2625.  Additionally, the Solicitations evaluate Past Performance "using Projects submitted under [the] Primary Experience Submission."  AR at 1103–05, 2143–45, 2634–35.  For each Primary Relevant Experience Project, offerors must submit a Past Performance assessment, the requirements of which are outlined in greater detail in the Solicitations.  AR at 1103, 2143, 2634.

Offerors can earn a maximum of 56,000 points for their Primary Relevant Experience Projects, making Primary Relevant Experience the evaluation factor that contributes the largest number of points to an offeror's overall score.  *See* AR at 1116–17, 2156–57, 2647–48.  Each Primary Relevant Experience Project gives offerors 4,000 points, contributing a potential total of 20,000 base points to an offeror's total score.  *See* AR at 1116–17, 2156–57, 2647–48.  Offerors can earn the full 56,000 points for Primary Relevant Experience Projects by submitting projects that meet certain specialized criteria.  *See* AR at 1116–17, 2156–57, 2647–48.  For example, offerors that submit projects with a contract value equal to or greater than $10 million can earn an additional 3,000 points per qualifying Primary Relevant Experience Project.  *See* AR at 1116–17, 2156–57, 2647–48.  Further, offerors can earn additional points for Primary Relevant Experience by submitting (1) projects completed for various government customers; (2) cost-reimbursement

11

projects; (3) task order awards on multiple-award contracts; (4) projects outside the contiguous United States; (5) projects related to cybersecurity experience; and (6) projects demonstrating a breadth of technological experiences.  *See* AR at 1112–18, 2152–58, 2643–49.  In addition to the 56,000 possible points earned for Primary Relevant Experience Projects, offerors can earn an additional 20,000 points for Past Performance, which GSA also evaluates based on the Primary Relevant Experience Projects an offeror submits.  AR at 1117–18, 2157, 2648.

In contrast, Emerging Technology Relevant Experience Projects have a contract value of $250,000 or greater and involve performance of one of the following technologies: (1) Advanced and Quantum Computing, (2) Artificial Intelligence, (3) Automation Technology, (4) Distributed Ledger Technology, (5) Edge Computing, or (6) Immersive Technology.  *See* AR 1101–02, 2140–41, 2632.  Emerging Technology Relevant Experience Projects target cutting-edge technological fields, and fewer small businesses will have experience in such fields.  *See* Transcript of Oral Argument, dated Feb. 15, 2023 (ECF No. 41) (Oral Arg. Tr.) at 50:1–7 (Defendant's counsel acknowledging "[t]he emerging technology experiences included past experience with artificial intelligence, edge computing, immersive technology, advanced and quantum computing. . . . A small business, they're not all going to be [able to] do that").  As such, the submission of Emerging Technology Relevant Experience Projects is entirely optional under the Solicitations, and an offeror may submit a maximum of three such projects for consideration.  *See* AR at 1100, 2140, 2631. Each submitted Emerging Technology Relevant Experience Project contributes 1,000 points to an offeror's overall score.  AR at 1117, 2157, 2648.  Offerors may also earn up to an additional 1,000 points if the submitted Emerging Technology Relevant Experience Projects demonstrate breadth of experience in emerging technologies.  AR at 1117, 2157, 2648.  Thus, Emerging

Technology Relevant Experience Projects can contribute a maximum of 4,000 points to an offeror's score.  AR at 1117, 2157, 2648.

Generally, Relevant Experience Projects (either Primary Relevant Experience Projects or Emerging Technology Relevant Experience Projects) "may be from the Offeror or any proposed subcontractor."  AR at 1090, 2129, 2620; *see also* 13 C.F.R. § 125.2(g).  However, the Solicitations include several provisions qualifying that rule.  The Solicitations state: "For offers from SBA Mentor-Protégé joint ventures, a minimum of one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from the Protégé or the offering Mentor-Protégé Joint Venture.  No more than three Primary Relevant Experience Projects may be provided by the Mentor."[10]  AR at 1088, 2127, 2619.  The WOSB and SDVOSB Solicitations likewise include the additional requirement that, for JVs involving WOSB or SDVOSB members, at least one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from a WOSB or SDVOSB member of the JV, respectively, or from the offering JV itself.  *See* AR at 2127, 2619.  Finally, for any WOSB or SDVOSB offerors, including small business teaming arrangements, "a minimum of one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from" a WOSB or SDVOSB, respectively.  AR at 2132, 2624.  However, this last requirement may be fulfilled by "the offeror

---

[10] GSA added this provision to the Solicitations in response to a GAO protest filed on March 28, 2022.  *See* AR at 3047–53.  The protest criticized a prior version of the Solicitations that allowed all of a mentor-protégé JV's Relevant Experience requirements to come from the mentor, without any contributions made by the protégé.  AR at 3056.  The protesting party alleged that the Solicitations violated 13 C.F.R. § 125.8(e), which requires agencies to "consider work done and qualifications held individually by each partner to the joint venture."  AR at 3049.  In response, GSA filed a notice of corrective action to address the concerns raised through the protest.  AR at 3054–55.  The GAO accordingly dismissed the protest as "academic" on April 25, 2022.  AR at 3056–57.  To remedy the identified issue, GSA amended the Solicitations to incorporate the requirement that either the protégé firm or the mentor-protégé JV must provide at least one Relevant Experience Project for consideration.  AR at 167–339; AR at 1327–1499.

itself, a proposed subcontractor, or a member of a joint venture."  AR at 2944; *see id.* at 2129, 2620.

### C.  Evaluation of Proposals – No Consideration of Price at IDIQ-Level Pursuant to Class Deviation CD-2020-14

Traditionally, agencies must "include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals."  41 U.S.C. § 3306(c)(1)(B); *see also* FAR 15.304(c)(1)(i) ("Price or cost to the Government shall be evaluated in every source selection . . . .").  However, the Polaris Solicitations do not include cost or price to the government as an evaluation criterion for awarding the IDIQ contracts.  AR at 1112, 2152, 2643.  Instead, GSA states it will evaluate cost and price at the individual task order level.  AR at 1025, 2064, 2554.  In making this choice, GSA relied on 41 U.S.C. § 3306(c)(3), which provides an exception for "certain indefinite delivery, indefinite quantity multiple-award contracts . . . for services acquired on an hourly rate."  41 U.S.C. § 3306(c)(3).  The statute reads as follows:

> If an executive agency issues a solicitation for one or more contracts for services to be acquired on an hourly rate basis . . . and the executive agency intends to make a contract award to each qualifying offeror and the contract or contracts will feature individually competed task or delivery orders based on hourly rates . . . the contracting officer need not consider price as an evaluation factor for contract award; and . . . cost or price to the Federal Government shall be considered in conjunction with the issuance . . . of any task or delivery order under any contract resulting from the solicitation.

41 U.S.C. § 3306(c)(3).  Though this statute is binding on federal agencies, the FAR has not yet been updated to incorporate 41 U.S.C. § 3306(c)(3).[11]

---

[11] In August 2018, the FAR Council opened a case to implement this statutory change into the FAR.  *See* FAR Council Case Number 2018-14 (opened August 22, 2018).  The Council's report on this proposed rule change is due May 24, 2023.  *Id.*

On August 14, 2020, GSA issued Class Deviation[12] CD-2020-14 to informally alter the language of the FAR and adopt the exception found in Section 3306(c)(3).  FAR Class Deviation - Enhancing Competition at the Order Level for Certain Indefinite Delivery, Indefinite Quantity Multiple-Award Contracts (Class Deviation CD-2020-14 or Class Deviation).[13]  Class Deviation CD-2020-14 applies to all GSA contracting activities for acquisitions that are "[f]or the award of [IDIQ] multiple-award contracts for services that will be acquired on an hourly rate basis."  *Id.* ¶ 4.  Under the Class Deviation, "[t]o be eligible for consideration [for the application of the 41 U.S.C. § 3306(c)(3) exception] by the [Senior Procurement Executive], the *predominant* amount of the acquisition must be for services that will be acquired on an hourly rate basis."  *Id.* ¶ 5 (emphasis added).  The Class Deviation sought to "amend" several FAR provisions, including FAR 4.1005-2(a)(2), 13.106-1, 15.304, 16.5, and 16.601, to reflect the exception in Section 3306(c)(3).  *Id.* ¶ 8.  In doing so, GSA made the most extensive changes to FAR Subpart 16.5 "to implement the exception provided by 41 U.S.C. § 3306(c)(3) for certain IDIQ multiple-award contracts."  *Id.*  The Class Deviation amended language for FAR Subpart 16.5 as follows:

> A contracting officer need not consider price as an evaluation factor for award . . . when all of the following conditions exist—
>     (1) The solicitation is to establish multiple-award indefinite-delivery, indefinite-quantity contracts for services to be acquired on an hourly rate basis;
>     (2) The solicitation states the Government intends to make award to each qualifying offeror and defines the criteria for what constitutes a qualifying offeror;

---

[12] Deviations are policies, procedures, solicitation provisions, contract clauses, methods, or practices of conducting acquisitions that are "inconsistent with the FAR."  FAR 1.401 (defining "deviation").  "[D]eviations from the FAR may be granted . . . when necessary to meet the specific needs and requirements of each agency."  FAR 1.402.  "Class deviations affect more than one contract" and "may be authorized by agency heads or their designees."  FAR 1.404.

[13] *Acquisition Policy Library & Resources – Class Deviations: CD-2020-14*, U.S. General Services Administration,     https://www.gsa.gov/policy-regulations/policy/acquisition-policy/acquisition-policy-library-resources#ClassDeviations (last visited Feb. 23, 2023).

(3) The resultant contracts will feature individually competed task or delivery orders based on hourly rates; and

(4) Cost or price shall be considered in conjunction with the issuance of any task or delivery order issued under any contract resulting from the solicitation . . . .

Class Deviation CD-2020-14 at 5.

On March 1, 2022, GSA's Senior Contracting Officers for the Polaris Program drafted a memorandum for the Senior Procurement Executive requesting approval to apply Class Deviation CD-2020-14 to the Polaris Solicitations. AR at 2906–13. In their request, the Contracting Officers indicated that application of the Class Deviation would be appropriate for the Polaris Solicitations because, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ AR at 2907. In response, the Senior Procurement Executive issued Supplement 2 to Class Deviation CD-2020-14 on March 18, 2022, approving the "use of Class Deviation 2020-14 authority for awarding labor rates with no stated price on the line item or sub-line item at the contract level for [the] 'Polaris Program' of [IDIQ] multiple-award contracts." Supplement 2 to Class Deviation CD-2020-14 (Supplement 2), AR at 2904. The Senior Procurement Executive further elaborated that Class Deviation CD-2020-14 "allowed for the use of 'unpriced labor' categories at the contract level for certain IDIQ multiple-award contracts." *Id.* Supplement 2 does not, however, include further explanation regarding why the Polaris Solicitations qualify for the Section 3306(c)(3) exception.

## **JURISDICTION AND STANDARD OF REVIEW**

The United States Court of Federal Claims maintains jurisdiction over pre-award bid protests pursuant to 28 U.S.C. § 1491(b). *See* 28 U.S.C. § 1491(b). Section 1491(b)(1) grants the

court jurisdiction over protests filed "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . without regard to whether suit is instituted before or after the contract is awarded." *See* 28 U.S.C. § 1491(b)(1).  An interested party is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract." *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1299 (Fed. Cir. 2001)).  The court evaluates bid protests using the same standard of review applied under the Administrative Procedure Act (APA) to review agency action.  *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review outlined in 5 U.S.C. § 706); *see Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (citing *Bannum v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).  Specifically, the court shall not set aside agency procurement action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

To succeed in a bid protest under this standard, a protestor must demonstrate that either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) (quoting *Weeks Marine*, 575 F.3d at 1358); *see also Tinton Falls Lodging Realty, LLC v. United Sates*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) ("In applying ["arbitrary and capricious" review] to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of regulation or procedure.").  The protestor must also demonstrate that any alleged error in the procurement process somehow prejudiced the protesting firm.  *See, e.g.*, *Am. Relocation*

*Connections, LLC v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019) (citing *Bannum*, 404 F.3d at 1357–58) ("[W]e must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence."); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum*, 404 F.3d at 1351) ("To prevail in a bid protest case, the protestor must show that it was prejudiced by the government's actions."). "[O]nly a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief." *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1342 (Fed. Cir. 1995) (quoting *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

Courts apply a less stringent prejudice standard to pre-award protests due to the more limited factual landscape involved in such cases. *See Weeks Marine*, 575 F.3d at 1361–62 (acknowledging "there is no factual foundation for a 'but for' prejudice analysis" in the context of a pre-award protest of a solicitation); *cf. Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348–49 (Fed. Cir. 2013) (applying the "substantial chance" test for prejudice where there was "an adequate factual predicate to ascertain under the traditional 'substantial chance' standard whether [the protestor] was prejudiced"). Whereas a post-award protestor must demonstrate it had a "substantial chance" of receiving the award absent the alleged procurement error, a pre-award protestor need only allege a "non-trivial competitive injury which can be addressed by judicial relief" to show prejudice. *Weeks Marine*, 575 F.3d at 1359–63.[14] The U.S. Court of Appeals for

---

[14] In *Weeks Marine*, the Federal Circuit ascribed the "non-trivial competitive injury" standard for prejudice within the context of standing to file a pre-award bid protest. *See Weeks Marine*, 575 F.3d 1359–63 ("[W]e conclude that in a pre-award protest such as the one before us, [a] prospective bidder or offeror must establish 'a non-trivial competitive injury which can be redressed by judicial relief' to meet the standing requirement of § 1491(b)(1)."). Per the Federal Circuit, to establish standing in a bid protest, an "interested party" must demonstrate it has a "direct economic interest" that "would be affected by the award of the contract or failure to award the contract." *Id.* at 1359 (quoting *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302). To establish a "direct economic interest"

18

the Federal Circuit (Federal Circuit) has expounded on the issue of prejudice in a pre-award protest, noting that courts should apply something akin to the "harmless error" rule that courts generally apply in ordinary civil cases. *Am. Relocation Connections*, 789 F. App'x at 228. Specifically, the Federal Circuit has noted that a pre-award protestor must demonstrate "a greater-than-insignificant chance" that correcting the agency's errors could lead to a different result for the protestor. *Id.*

## DISCUSSION

Plaintiffs' pre-award bid protest challenges the propriety of the SB, WOSB, and SDVOSB Pool Solicitations on three grounds. Specifically, Plaintiffs' protest alleges that GSA violated various procurement laws and regulations in both the design and the administration of the Polaris Solicitations. First, Plaintiffs argue GSA's decision to prohibit mentor-protégé JVs that share a mentor from bidding on the same Solicitation renders the Polaris Solicitations "unduly restrictive"

---

sufficient for standing, the protestor must demonstrate that the agency action injured, or prejudiced, the protestor. *See id.* at 1359.

Thus, the Federal Circuit has treated the prejudice inquiry for bid protests as inextricably linked with the standing inquiry. *See, e.g.*, *Weeks Marine*, 575 F.3d at 1359–63; *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002) ("To some extent, the Court of Federal Claims appears to have treated the question of whether [the protestor] was prejudiced by the [agency] as different from the question of whether [the protestor] has standing. In fact, prejudice (or injury) is a necessary element of standing."). In other cases, however, the Federal Circuit has emphasized a distinction between the prejudice inquiry relevant to standing and the merits-based prejudice inquiry required for a successful bid protest. *See, e.g.*, *Am. Relocation Connections*, 789 F. App'x at 227 ("We acknowledge that many of our bid protest cases discuss the requirement to show prejudice in the context of standing. . . . But we do not read those cases as holding that satisfying § 1491(b)(1)'s standing requirements necessarily establishes that any procedural error committed by the procuring agency was prejudicial error on the merits."); *Labbatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) (emphasizing the distinction between the "direct economic interest" inquiry and the "prejudice" inquiry to underscore that an economically interested party may nevertheless suffer a non-prejudicial error insufficient to invalidate a procurement). As no party contests Plaintiffs' standing here, this Court will assess prejudice from a merits-based perspective.

of competition and rests on an inappropriate interpretation of SBA regulation 13 C.F.R. § 125.9(b)(3)(i). *See* SHS MJAR at 16–23; VCH MJAR at 16–23. Second, Plaintiffs assert the Solicitations violate regulations governing how an agency may evaluate mentor-protégé JVs, WOSB JVs, and SDVOSB JVs during a procurement by subjecting these entities to "the same" evaluation criteria as offerors generally. SHS MJAR at 26–34; VCH MJAR at 26–34. Third, Plaintiffs contend the Polaris Solicitations violate federal procurement statute 41 U.S.C. § 3306(c) by failing to consider price as an evaluation factor at the IDIQ level. SHS MJAR at 34–37; VCH MJAR at 34–37. This Court considers each of Plaintiffs' claims in turn.

I.      **GSA Properly Excluded Mentor-Protégé JVs with the Same Mentor from Bidding on the Small Business Pool Solicitation Pursuant to 13 C.F.R. § 125.9(b)(3)(i).**

Plaintiffs first argue they are improperly barred from submitting proposals on the SB Pool Solicitation due to GSA's purported misinterpretation and misapplication of SBA regulation 13 C.F.R. § 125.9(b)(3)(i). *See* SHS MJAR at 16–23; VCH MJAR at 16–23. Plaintiffs note that because their respective mentor members have already submitted proposals on the SB Pool Solicitation through another mentor-protégé JV, GSA has prohibited Plaintiffs from likewise proposing on the SB Pool Solicitation pursuant to 13 C.F.R. § 125.9(b)(3)(i). SHS Compl. ¶¶ 37–38; VCH Compl. ¶¶ 38–39; SHS MJAR at 20; VCH MJAR 20. The terms of the Polaris Solicitations do not expressly reference Section 125.9(b)(3)(i); instead, GSA invoked Section 125.9(b)(3)(i) in answering a question it had received from a member of industry regarding the Solicitations. *See* Small Business Pool Question and Response Document #4, Question 292 (AR at 890). Question 292 inquired whether a mentor belonging to multiple mentor-protégé JVs may submit multiple proposals in the same Solicitation pool so long as the JVs do not rely on the same Relevant Experience Projects in their bids. *Id.* Responding in the negative, GSA specifically referenced 13 C.F.R. § 125.9(b)(3)(i) to reiterate that "a mentor that has more than one protégé

cannot submit competing offers in response to a solicitation for a specific procurement through separate joint ventures with different proteges." *Id.* Said differently, under GSA's interpretation of Section 125.9(b)(3)(i) as applied to the Polaris Solicitations, if two mentor-protégé JVs share the same mentor, the JVs cannot submit competing offers to enter the SB pool.

Plaintiffs make several arguments in support of their position. First, Plaintiffs contend GSA's reliance on Section 125.9(b)(3)(i) in imposing such a prohibition is misplaced because 13 C.F.R. § 125.9 "expressly deals with entering into the SBA Mentor-Protégé Program" and does not govern procurement activity after the mentor-protégé JV has been formed. SHS MJAR at 20; VCH MJAR at 20; Oral Arg. Tr. at 6:13–15 ("First, 13 C.F.R. 125.9 is not a procurement regulation. It is a regulation that deals with entry into the Mentor-Protégé Joint Venture Program."). Second, Plaintiffs also argue that even if Section 125.9(b)(3)(i) were to apply beyond the formation of a mentor-protégé relationship, the regulation should still not apply to the Polaris Solicitations because the Solicitations do not involve "competing offers" at the IDIQ level. SHS MJAR at 21; VCH MJAR at 21. Rather than involving "competing offers," according to Plaintiffs, the self-scoring regime used in the Polaris Solicitations involves no true competition, as it forces each bidder to compete against itself rather than against other offerors. SHS MJAR at 21–22; VCH MJAR at 21–22 (same); *see* Pl. Reply at 8–9. Instead, Plaintiffs contend competition exists only at the task order level because that is the level at which discrete service projects are awarded based on competitive bidding. SHS MJAR at 21–23; VCH MJAR at 21–23; Oral Arg. Tr. at 17:1–3 ("[T]he trigger for competition is actually at the task order level. It's not at the upper level."). Third, applying Section 125.9(b)(3)(i)'s prohibition to the Polaris Solicitations is further inappropriate, according to Plaintiffs, because it is the protégé, and not the mentor, that has authority to make operational decisions for the JV under SBA regulation. *See* SHS MJAR at 22–

23; VCH MJAR at 22–23.  Thus, according to Plaintiff, the decision to preclude mentor-protégé

JVs that share a mentor from bidding on the same Solicitation harms protégés, unduly restricts

competition, and violates federal procurement law.  *See* SHS MJAR at 20–23; VCH MJAR at 20–

23.

Defendant disagrees, both with Plaintiffs' interpretation of 13 C.F.R. § 125.9(b)(3)(i) and

with Plaintiffs' understanding of what constitutes a "competing offer."  Cross-MJAR at 24–37.

Defendant argues that 13 C.F.R. § 125.9(b)(3)(i) expressly prohibits mentor-protégé JVs with the

same mentor from competing against one another on future procurements.  Cross-MJAR at 25–26.

Defendant contends that because the SBA's rulemaking and regulations have the "force and effect

of law," GSA lacked any discretion to disregard 13 C.F.R. § 125.9(b)(3)(i).  *Id.* (citing *Otis Steel*

*Prods. Corp v. United States*, 316 F.2d 937, 940 (Ct. Cl. 1963)).  According to Defendant, that the

offers are self-scored does not eliminate competition, as Plaintiffs suggest, because "scoring is

relative to the total group of offerors, and only the top scoring offerors will make it into the top

100 or 80 or 70 offeror tranches and thus be eligible to be awarded contracts."  Cross-MJAR at 30.

Thus, Defendant asserts that offerors with scores too low to be included within the tranche do not

receive an IDIQ contract.  *Id.*

The parties' disagreement comes down to two issues: (1) the scope of Section

125.9(b)(3)(i), and (2) the appropriate interpretation of the term "competing offers" as used in that

regulation.  On both issues, this Court agrees with Defendant: GSA reasonably prohibited mentor-

protégé JVs with the same mentor from proposing on the same Polaris Solicitation by applying 13

C.F.R. § 125.9(b)(3)(i).

In interpreting federal regulations, this Court must "apply the same interpretive rules

[courts] use when analyzing the language of a statute."  *Boeing Co. v. Sec'y of Air Force*, 983 F.3d

1321, 1327 (Fed. Cir. 2020) (citing *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015)).  Thus, a court must "first consider the 'plain language [of the regulation] and consider the terms in accordance with their common meaning.'"  *Mass. Mut. Life Ins. Co.*, 782 F.3d at 1365 (quoting *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997)) (alteration in original).  As part of this process, the court must consider "the text of the regulation as a whole, reconciling the section in question with sections related to it."  *Id.* (quoting *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006)).  "If the regulatory language is clear and unambiguous, the inquiry ends with the plain meaning."  *Hanser v. McDonough*, 56 F.4th 967, 970 (Fed. Cir. 2022) (quoting *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017)).  Section 125.9(b)(3)(i) states, "A mentor that has more than one protégé cannot submit competing offers in response to a solicitation for a specific procurement through separate joint ventures with different protégés."  13 C.F.R. § 125.9(b)(3)(i).  As detailed below, this Court finds that GSA's interpretation of Section 125.9(b)(3)(i) and its application to the Polaris Solicitations reflects a reasonable reading of the regulation's clear and unambiguous language.

### A.   SBA Regulation 13 C.F.R. § 125.9(b)(3)(i) Governs a Mentor-Protégé JV's Procurement Activity Beyond Entry into the Mentor-Protégé Program.

GSA correctly interpreted 13 C.F.R. § 125.9(b)(3)(i) as governing a mentor-protégé JV's procurement activity beyond the formation of the mentor-protégé relationship.  Contrary to Plaintiffs' assertions, the scope of 13 C.F.R. § 125.9 extends beyond a firm's mere entry into the SBA Mentor-Protégé Program, as the regulation addresses the general "rules governing SBA's small business mentor-protégé program."  *See* 13 C.F.R. § 125.9 (titled "What are the rules governing SBA's small business mentor-protégé program?").  Indeed, Section 125.9 provides guidance regarding which firms may serve as mentors and protégés under the program.  *See* §§ 125.9(b)–(c).  It also details the written mentor-protégé agreement that parties must execute to

enter the program.  *See* § 125.9(e).  Additionally, Section 125.9(a) addresses the overall goals for the Mentor-Protégé Program; Section 125.9(d) outlines the benefits of participating in such a program; Section 125.9(g) establishes an annual evaluation scheme to assess the success of a mentor-protégé relationship; and Section 125.9(h) provides rules governing the termination of a mentor-protégé relationship.  Thus, it is incorrect to suggest, as Plaintiffs do here, that Section 125.9 in its entirety just "addresses how a mentor and a protégé can be approved for [the Mentor-Protégé Program]."  Oral Arg. Tr. at 6:16–17.  Section 125.9 provides the general framework for how mentor-protégé relationships shall be conducted at every phase of the relationship's life cycle, including during its procurement activities.

Likewise, the plain reading of Section 125.9(b)(3)(i) prohibits the precise conduct Plaintiffs urge this Court to allow: the regulation prevents mentor-protégé JVs comprised of the same mentor, but different protégés, from submitting competing proposals on a procurement.  *See* 13 C.F.R. § 125.9(b)(3)(i).  Nothing in the regulation's language obviously suggests its prohibitive scope applies only upon the formation of a mentor-protégé relationship.  In positing such an interpretation, Plaintiffs reference 13 C.F.R. § 125.9(b)(3), which provides guidelines for the formation of certain mentor-protégé relationships (i.e., those relationships formed between a mentor and its second and/or third protégé).  *See* SHS MJAR at 19–20; VCH MJAR at 19–20; 13 C.F.R. § 125.9(b)(3).  However, the plain language of Section 125.9(b)(3) likewise underscores the prohibition on competition between mentor-protégé JVs that share the same mentor.  *See* 13 C.F.R. § 125.9(b)(3) ("In order for SBA to agree to allow a mentor to have more than one protégé at a time, the mentor and proposed additional protégé must demonstrate that the added mentor-protégé relationship will not adversely affect the development of either protégé firm (e.g., *the second firm may not be a competitor of the first firm*).") (emphasis added).  Plaintiffs acknowledge,

as they must, that Section 125.9(b)(3) requires "mentors and additional protégés [to] make a commitment to SBA **prior to entering the SBA Mentor-Protégé Program** [that] (1) the additional protégé will not have an adverse impact on existing protégés and (2) the new protégé relationship will not compete for the same work." SHS MJAR at 19 (emphasis in original); VCH MJAR at 19 (same). Yet, such a commitment rings hollow if, as Plaintiffs suggest, the restriction in Section 125.9(b)(3)(i) applies only upon entry into the SBA Mentor-Protégé Program and does not apply during a mentor-protégé JV's participation in a procurement. There is no support for the interpretation Plaintiffs suggest; the regulation applies throughout the life of the mentor-protégé JV's participation in the Program.

Even further, adopting Plaintiffs' interpretations of Sections 125.9(b)(3) and 125.9(b)(3)(i) would render Section 125.9(b)(3)(i) superfluous. By its plain language, Section 125.9(b)(3) already forbids a mentor from forming a second or third mentor-protégé relationship if the additional protégés are "competitor[s] of the first [protégé] firm." 13 C.F.R. § 125.9(b)(3). Section 125.9(b)(3)(i), in turn, emphasizes the forward-looking consequences that accompany the commitment not to compete that all mentors make upon forming second and third mentor-protégé relationships: mentor-protégé JVs with the same mentor cannot submit competing offers on future procurements. *See* 13 C.F.R. § 125.9(b)(3)(i). Section 125.9(b)(3)(i) must govern activity beyond the formation of mentor-protégé relationships for it to perform any work within the larger regulatory scheme of 13 C.F.R. § 125.9. This is the only interpretation that gives meaning to both Sections 125.9(b)(3) and 125.9(b)(3)(i), and "it is a 'cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute [or regulation].'" *Shea v. United States*, 976 F.3d 1292, 1300 (Fed. Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 364 (2000)); *see Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion)

(acknowledging the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"); *Sierra Club v. EPA*, 536 F.3d 673, 680 (D.C. Cir. 2008) ("It is [a court's] duty to give effect, if possible, to every clause and word of a statute. . . . The same is true for regulations.") (alteration in original) (quotations and citations omitted).  Thus, this Court agrees with Defendant in concluding Section 125.9(b)(3)(i) operates to prohibit mentor-protégé JVs with the same mentor from submitting competing offers on future procurements, including the Polaris Solicitations.

SBA commentary in the Federal Register Notice of Final Rulemaking for Section 125.9 further demonstrates the strength of GSA's interpretation of 13 C.F.R. § 125.9(b)(3)(i).  *See* Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments, 85 Fed. Reg. 66,146, 66,168 (Oct. 16, 2020).  Contrary to Plaintiffs' insinuations, the SBA made clear that its intent in including the relevant language in Section 125.9(b)(3)(i) was to "clarif[y] that a mentor that has more than one protégé cannot submit competing offers in response to a solicitation for a specific procurement through separate joint ventures with different protégés."  *Id.*  The SBA underscored this purpose by highlighting that in acquiring a second protégé, the mentor "has already assured SBA that the two protégés would not be competitors.  If the two mentor-protégé relationships were approved in the same [North American Industry Classification System] code, then the mentor must have already *made a commitment that the two firms would not compete against each other*."  *Id.*  (emphasis added).  The Supreme Court has acknowledged that regulatory interpretations issued by an agency through the Federal Register carry enough agency authority to merit deference by a reviewing court.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (acknowledging precedent deferring to interpretations published in the Federal Register by the promulgating agency).  Thus, even if the language in Section 125.9(b)(3)(i) somehow qualified as

ambiguous such that deference to the SBA's interpretation were required, SBA's comments in the Federal Register support Defendant's interpretation of Section 125.9(b)(3)(i).

> **B.      The Polaris Solicitations Require the Submission of "Competing Offers" at the IDIQ Level, Making 13 C.F.R. § 125.9(b)(3)(i) Applicable to this Procurement.**

Plaintiffs' suggestion that the Polaris Solicitations do not require the submission of "competing offers" at the IDIQ level is unavailing.  Such a suggestion conflicts with the plain language and meaning of "competing offers" as used in 13 C.F.R. § 125.9(b)(3)(i).  *See Mass. Mut. Life Ins. Co.*, 782 F.3d at 1365 (acknowledging a court must "first consider the plain language [of the regulation] and consider the terms in accordance with their common meaning") (alteration in original) (internal quotations omitted).  Because SBA regulations do not define "competing offers," this Court turns to dictionary definitions to discern the term's plain meaning.  *See id.* at 1367 (quoting *Am. Express Co. v. United States*, 262 F.3d 1376, 1381 n.5 (2001)) ("It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation.").  "Compete" is defined as "to strive consciously or unconsciously for an objective (as position, profit, or a prize); [or to] be in a state of rivalry."  *Compete*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see Competing*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/competing (last visited Mar. 7, 2023) (defining "competing" as being "in a state of rivalry or competition (as for position, profit, or a prize)").  "Rivalry" is defined as "the act of rivaling; [or] the state of being a rival," and a "rival" is "one of two or more striving to reach or obtain something that only one can possess."  *Rivalry*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *Rival*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  Finally, "competition," defined generally as "the act or process of competing," also describes "the effort of two or more parties acting independently to secure the business of a

third party by offering the most favorable terms." *Competition*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).

Based on these terms' common meanings, the procurement structure employed under the Polaris Solicitations clearly involves the submission of "competing offers" as conceived under 13 C.F.R. § 125.9(b)(3)(i).[15]  Under the Polaris Solicitations, each offeror is independently vying to secure one of a limited number of positions within the Solicitation's pool of eligible IT service providers.  AR at 1112–14, 2152–54, 2643–45.  An offeror secures such a position by preparing a proposal that presents "the most favorable terms," relative to other offerors' submissions, by maximizing points earned for Relevant Experience; Past Performance; Systems, Certifications, and Clearances; and Risk Assessment.  *See Competition*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); AR at 1114–18, 2154–58, 2645–49.  By capping the number of firms allowed within each Solicitation pool, GSA has ensured that certain offerors will be excluded

---

[15] Plaintiffs argue the term "competing offers" is subject to multiple interpretations due to statements made by the SBA in the Federal Register Final Rule Notice for 13 C.F.R. § 125.9.  *See* SHS MJAR at 21; VCH MJAR at 21; Oral Arg. Tr. at 20:5–23:6; 85 Fed. Reg. at 66168.  The SBA made the referenced statement to address a specific hypothetical posed during the Notice & Comment period for Section 125.9.  85 Fed. Reg. 66168.  The hypothetical involved a single solicitation for an IDIQ contract that encompassed separate pools for small business, WOSB, and SDVOSB offerors.  *Id.*  The commenter queried whether two mentor-protégé JVs with the same mentor could bid on the single solicitation but compete for different pools under the solicitation.  *Id.*  In addressing the hypothetical, the SBA noted the "same mentor could submit an offer as a joint venture with one protégé for one pool and another offer as a joint venture with a second protégé for a different pool on the same solicitation because they would not be deemed competitors with respect to that procurement."  *Id.*  Thus, proposals submitted on different pools are not competing offers, even if submitted under a single solicitation.  However, the natural corollary to this notion is that proposals submitted for the *same* pool likely would be considered competing offers.  The outcome, according to the SBA, depended on an "interpretation of what 'competing offers' means" as used in 13 C.F.R. § 125.9(b)(3)(i).  *Id.*  Far from suggesting unfettered interpretations exist for what may constitute a "competing offer," SBA's commentary suggests "competing offers" do exist under the Polaris Solicitations at the IDIQ level, where two mentor-protégé JVs would be forced to compete for positions within the same pool.

entirely from receiving IDIQ contract awards.[16]   AR at 1113–14, 2153–54, 2644–45.   In other

words, the Solicitations force GSA to choose winners and losers.[17]   Yet, Plaintiffs suggest that the

self-scoring structure of the Polaris Solicitations eliminates the competitive nature of the

procurement.  *See, e.g.*, SHS MJAR at 21–22 ("[T]o the extent 'competing offers' even exist[], [it]

is with *each bidder itself*, and its own business judgment in forming a team and what score *it thinks*

is enough to merit an award.") (emphasis in original); VCH MJAR at 21–22 (same); Oral Ar. Tr.

at 10:5–7 ("[C]ompetition involves . . . some sort of tradeoff between offerors, some sort of

evaluation of how offerors are against one another, and that's not the case here.  The case here is

how each offeror stacks up on its own.").  This is incorrect.

Plaintiffs' assertion ignores the evaluation process outlined within the Solicitations.  In

compliance with each Polaris Solicitation, GSA will evaluate, verify, and rank the proposals

---

[16] Plaintiffs' counsel ultimately agreed with this understanding of the Solicitations' structure during Oral Argument.  *See* Oral Arg. Tr. at 9:14–19 ("[I]f an offeror does not have the same number of points, if it's the 130th offeror and it doesn't have the same number of points as the 90th offeror, then the solicitation says the 90th offeror gets in and the 130th doesn't.").

[17] Plaintiffs suggest that the Solicitation provision permitting ties in the final position in each pool eliminates competition from the procurement because it purportedly renders the size of each pool limitless.  SHS MJAR at 21–22; VCH MJAR at 21–22; *see* Pl. Reply at 8.  This argument is a red herring.  Under the Solicitations' scoring scheme, an offeror's proposal can earn a maximum of 95,000 points.  AR at 1118, 2158, 2649.  Those points are allocated between the four primary evaluation factors: (1) Relevant Experience; (2) Past Performance; (3) Systems, Certifications, and Clearances; and (4) Risk Assessment.  *See* AR at 1114–18, 2154–58, 2645–49.  These four primary factors, in turn, are further segregated into several layers of sub-criteria, each with independently assigned points totals.  *See* AR at 1114–18, 2154–58, 2645–49.  For example, offerors can earn varying amounts of points for Relevant Experience based on the contract value of the projects submitted, the degree of demonstrated experience with multiple federal government customers, and the breadth of relevant experience demonstrated, among other sub-criteria.  *See* AR at 1114–18, 2154–58, 2645–49.  Given the wide variety of points-generating criteria, it defies reason to suggest that a problematic number of offerors will prepare proposals with identical scores in the pool's final position.  Furthermore, Plaintiffs failed to offer convincing evidence to demonstrate that there is a high likelihood ties will occur at any position, let alone at precisely the final position in a pool.  *See, e.g.*, SHS MJAR at 22 (citing, without further elaboration, "common industry knowledge" to assert that successful offerors will prepare proposals with "a perfect or near-perfect score"); VCH MJAR at 22 (same).

against one another to ensure only the highest-rated, technically qualified offerors receive an award.  AR at 2856 ("For Polaris, the best value basis for awards will be determined by the Highest Technically Rated Qualifying Offerors."); AR at 1113–14, 2153–54, 2644–45 (acknowledging the agency will "rank[] the proposals in order from highest total claimed score to lowest total claimed score").  The Solicitations' self-scoring points system merely offers a numerical method to evaluate an offeror's ability to meet the agency's needs, as expressed through the Solicitations' stated evaluation criteria.  Correspondingly, the ranking and verification process inherently compares the relative strength of each proposal against proposals submitted by competing offerors, thereby eliminating from consideration those offerors that fail to prepare the highest-scoring proposals.  Contractors in every government procurement must make strategic decisions about how to best design a proposal to achieve award.  *See* Defendant's Reply in Support of its Cross-MJAR (Def. Reply) at 8 ("Competition in a business context always involves choices and decisions by contractors about how to structure a proposal in order to try to receive an award.").  Such an exercise is a hallmark of competition rather than evidence that competition is lacking.  Thus, this Court must conclude the offers submitted on the Polaris Solicitations are indeed "competing offers" under Section 125.9(b)(3)(i).[18]

### C.  Plaintiffs' Arguments Alleging Harms to Protégés Merely Reflect Plaintiffs' Disagreement with SBA's Regulations.

Plaintiffs argue GSA's decision to apply 13 C.F.R. § 125.9(b)(3)(i) to the Polaris Solicitations lacks a rational basis because it conflicts with SBA regulations defining the structure

---

[18] At Oral Argument, Defendant's counsel suggested that under the Solicitations' terms, a mentor-protégé JV could act as a subcontractor on a proposal for a position in a pool in which another mentor-protégé joint venture with the same mentor is already competing.  *See* Oral Arg. Tr. at 53:1–57:17.  This Court disagrees with such an interpretation of the Solicitations and would consider this circumstance as constituting "competing offers" under 13 C.F.R. § 125.9(b)(3)(i).

of mentor-protégé relationships and ultimately harms protégés.  *See* SHS MJAR at 21–23; VCH

MJAR at 21–23.  These arguments, however, are unpersuasive.

Certain SBA regulations require that the protégé member of the JV control the JV's

operations.  *See* SHS MJAR at 22; VCH MJAR at 22; *see, e.g.*, 13 C.F.R. § 125.8(b)(2)(ii) (making

the protégé member the JV's managing venturer charged with making day-to-day decisions for the

JV); 13 C.F.R. § 125.8(b)(2)(iii) (requiring the protégé member to own at least 51% of the joint

venture).  According to Plaintiffs, these regulations indicate that mentors could never submit

competing offers through two mentor-protégé JVs because the authority to make decisions for the

JV rests squarely with the protégé.  SHS MJAR at 22; VCH MJAR at 22.  It is the protégé who

decides whether to submit proposals on future procurements, and excluding mentor-protégé JVs

from proposing on a solicitation due to Section 125.9(b)(3)(i) unnecessarily prevents protégés from

accessing opportunities to grow as a business.  SHS MJAR at 22–23; VCH MJAR at 22–23.

Such a critique, however, merely highlights Plaintiffs' disagreement with the SBA's

regulations and does not suggest arbitrary and capricious conduct by GSA.  Section 125.9(b)(3)(i)

states that a "mentor . . . cannot submit competing offers in response to a solicitation for a specific

procurement through separate joint ventures with different protégés."  13 C.F.R. § 125.9(b)(3)(i).

Adopting an interpretation that mentors can never actually submit competing offers under the

SBA's regulations would presume the SBA passed a regulation (Section 125.9(b)(3)(i)) that has

no practical application or purpose.  This Court will not fault GSA for interpreting Section

125.9(b)(3)(i) in a manner that gives the provision meaning, despite any apparent incongruities

which exist across the various SBA regulations.  *Sullivan v. McDonald*, 815 F.3d 786, 790 (Fed.

Cir. 2016) ("[W]e attempt to give full effect to all words contained within that statute or regulation,

thereby rendering superfluous as little of the statutory or regulatory language as possible.")

(quoting *Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999)).  Further, Plaintiffs' argument that GSA's interpretation of 13 C.F.R. § 125.9(b)(3)(i) harms protégés has broad implications.  If exclusion from bidding on the SB Solicitation indeed harms either protégé member of SHS or VCH, perhaps this suggests the mentor-protégé relationships should not have been approved in the first instance.  *See* 13 C.F.R. § 125.9(b)(3) ("In order for SBA to agree to allow a mentor to have more than one protégé at [a] time, the mentor and proposed additional protégé must *demonstrate that the added mentor-protégé relationship will not adversely affect the development of either protégé firm* (e.g., the second firm may not be a competitor of the first firm).") (emphasis added).  It does not suggest, however, that GSA should simply ignore 13 C.F.R. § 125.9(b)(3)(i).

For the foregoing reasons, this Court holds GSA correctly excluded Plaintiffs from submitting proposals on the SB Pool Solicitation pursuant to 13 C.F.R. § 125.9(b)(3)(i).

## II.    The Polaris Solicitations Violate SBA Regulations Governing How an Agency May Evaluate Mentor-Protégé, WOSB, and SDVOSB JV Offerors During a Procurement.

In their second claim, Plaintiffs argue that the Polaris Solicitations violate SBA regulation 13 C.F.R. § 125.8(e),[19] which governs joint venture offerors on government procurements and

---

[19] Plaintiffs allege that in addition to violating 13 C.F.R. § 125.8, the Polaris Solicitations violate 13 C.F.R. §§ 127.506 and 125.18.  *See* SHS MJAR at 27; VCH MJAR at 27.  These regulations address SBA requirements for WOSB and SDVOSB offerors, respectively.  *See* 13 C.F.R. § 127.506; 13 C.F.R. § 125.18 (2022).  However, in their MJARs, both parties' arguments focus primarily on the Polaris Solicitations' alleged violation of 13 C.F.R. § 125.8, the regulation governing mentor-protégé JV offerors.  *See generally* SHS MJAR at 26–34; VCH MJAR at 26–34; Pl. Reply at 13–22; Cross-MJAR at 38–51; Def. Reply at 14–23.  Accordingly, this Court will likewise focus its discussion on Section 125.8 and other regulations governing mentor-protégé JV offerors.  However, to the extent there is overlap between the regulations governing mentor-protégé JVs and the regulations governing WOSB and SDVOSB JVs, the Court's holdings on the former apply with equal force to the latter.

Further, both parties' MJAR briefs cite 13 C.F.R. § 125.18 as the relevant SBA regulation governing SDVOSB offerors for purposes of this protest.  *See, e.g.*, SHS MJAR at 27; VCH MJAR at 27; Cross-MJAR at 39; *see also* 13 C.F.R. § 125.18 (2022).  However, effective January 1, 2023,

prescribes specific rules applicable to mentor-protégé JV offerors.  *See generally* SHS MJAR at

26–34; VCH MJAR at 26–34; Pl. Reply at 13–22; 13 C.F.R. § 125.8.  Section 125.8(e) reads as

follows:

> When evaluating the capabilities, past performance, experience, business systems
> and certifications of an entity submitting an offer for a contract set aside or reserved
> for small business as a joint venture established pursuant to this section, a procuring
> activity must consider work done and qualifications held individually by each
> partner to the joint venture as well as any work done by the joint venture itself
> previously.  A procuring activity may not require the protégé firm[20] to individually
> meet the same evaluation or responsibility criteria as that required of other offerors
> generally.  The partners to the joint venture in the aggregate must demonstrate the
> past performance, experience, business systems and certifications necessary to
> perform the contract.

13 C.F.R. § 125.8(e).[21]

---

all SBA regulations pertaining to SDVOSBs were moved to 13 C.F.R. § 128.400, *et seq.*  *See* 13
C.F.R. § 128.400–408.  The language previously incorporated in 13 C.F.R. § 125.18(b)(5), which
is the provision specifically addressed in the parties' briefs, was moved to 13 C.F.R. § 128.402(f).
*Compare* 13 C.F.R. § 125.18(b)(5) (2022), *with* 13 C.F.R. § 128.402(f).  Because the Polaris
Solicitations were issued and this protest was filed in 2022, prior to the regulatory change, this
Court will reference 13 C.F.R. § 125.18 throughout this Memorandum.

[20] The term "protégé firm" appears only once in Section 125.8.  *See* 13 C.F.R. § 125.8(e).
However, the term is used extensively throughout 13 C.F.R. § 125.9, which governs the Mentor-
Protégé Program, to describe the protégé member of a mentor-protégé JV.  *See* 13 C.F.R. § 125.9.
For example, Section 125.9(c) discusses the requirements to qualify as a "protégé firm" and obtain
a mentor through the Mentor-Protégé Program.  13 C.F.R. § 125.9(c).  Likewise, Section
125.9(d)(3)(iii) states that if a "*protégé firm* no longer qualifies as a small business . . . any joint
venture between the protégé and its mentor will no longer be able to seek additional contracts or
subcontracts as a small business." 13 C.F.R. § 125.9(d)(3)(iii) (emphasis added).  Finally, Section
125.9(h)(1)(iii), which outlines consequences for when a mentor fails to provide the required
assistance to its protégé, draws a clear distinction between the protégé firm and the joint venture
entity: "Where a protégé firm is able to independently complete performance of any such contract,
SBA may recommend to the procuring agency to authorize a substitution of the protégé firm for
the joint venture." 13 C.F.R. § 125.9(h)(1)(iii).  These provisions, among others, clarify that the
term "protégé firm," as used in Section 125.8(e), references the protégé member of the mentor-
protégé JV, rather than the JV itself.

[21] *See* 13 C.F.R. § 127.506(f) ("When evaluating the capabilities, past performance, experience,
business systems, and certifications of an entity submitting an offer for an EDWOSB or WOSB
contract as a joint venture established pursuant to this section, a procuring activity must consider
work done and qualifications held individually by each partner to the joint venture as well as any

Plaintiffs assert certain requirements contained in the Polaris Solicitations violate Section 125.8(e)'s limitation that "[a] procuring activity may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of other offerors generally."  13 C.F.R. § 125.8(e).  First, Plaintiffs criticize the Solicitations' requirement that for mentor-protégé JV offerors, "a minimum of one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from the Protégé or the offering Mentor-Protégé Joint Venture."  SHS MJAR at 28 (citing the Solicitations); VCH MJAR at 28 (same); *see* AR at 1088, 2127, 2619.[22]  Plaintiffs do not dispute that under 13 C.F.R. § 125.8(e), the agency must require the protégé to submit a Relevant Experience Project for consideration.  *See* Pl. Reply at 16 ("[T]he question of whether or not the Agency should consider or require a Relevant Experience project from a protégé (or the protégé by virtue of its joint venture) is *not in dispute*.") (emphasis in

---

work done by the joint venture itself previously.  A procuring activity may not require the EDWOSB or WOSB small business concern to individually meet the same evaluation or responsibility criteria as that required of other offerors generally.  The partners to the joint venture in the aggregate must demonstrate the past performance, experience, business systems, and certifications necessary to perform the contract."); 13 C.F.R. § 125.18(b)(5) (2022) ("When evaluating the capabilities, past performance, experience, business systems, and certifications of an entity submitting an offer for an SDVO contract as a joint venture established pursuant to this section, a procuring activity must consider work done and qualifications held individually by each partner to the joint venture as well as any work done by the joint venture itself previously.  A procuring activity may not require the SDVO SBC to individually meet the same evaluation or responsibility criteria as that required of other offerors generally.  The partners to the joint venture in the aggregate must demonstrate the past performance, experience, business systems, and certifications necessary to perform the contract.").

[22] In addition to the requirement placed on mentor-protégé JVs, the WOSB and SDVOSB Solicitations include the additional requirement that, for JVs involving WOSB or SDVOSB members, at least one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from a WOSB or SDVOSB member of the JV, respectively, or from the offering JV itself.  *See* AR at 2127, 2619.  These Solicitations also include the requirement that for any WOSB or SDVOSB offerors, including small business teaming arrangements, "[a] minimum of one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from" a WOSB or SDVOSB, respectively.  AR at 2132, 2624.

original).  Instead, Plaintiffs assert the Solicitations impose a heightened[23] evaluation criterion on protégé firms relative to offerors generally by "allow[ing] prime/subcontractor teams to obtain all Relevant Experience projects from subcontractors, while protégé firms and their joint ventures must produce one of their own projects independent of any subcontractors they propose."  SHS MJAR at 28–30; VCH MJAR at 28–30 (same).  Second, Plaintiffs argue that the Solicitations further violate SBA regulations by assessing a protégé's Relevant Experience Project using the same evaluation criteria and points scale as projects submitted by offerors generally.  *See* SHS MJAR at 30–31; VCH MJAR at 30–31.

Defendant disagrees with both of Plaintiffs' assertions.  *See generally* Cross-MJAR at 38–51; Def. Reply at 14–23.  According to Defendant, the Solicitations "do not require proteges to meet the same criteria as other *offerors*" because a protégé (or its associated mentor-protégé JV) is only required to individually provide one Relevant Experience Project, whereas "*an offeror* must demonstrate at least three Primary Relevant Experience projects."  Cross-MJAR at 38 (emphasis in original).  Defendant also argues that Plaintiffs' assertions fail to perceive "the critical distinctions between a joint venture *offeror*, an individual member of that joint venture (such as a protégé), and a prime contractor *offeror* working with a subcontractor."  Cross-MJAR at 40 (emphasis in original); *see id.* at 46 (noting Plaintiffs "incorrectly equate the status of a protégé with that of the joint venture *offeror* (within which the protégé sits in a mentor-protégé relationship)").  Because the Solicitations require *either* the protégé or the mentor-protégé JV to

---

[23] Both parties agree that the phrase "the same evaluation or responsibility criteria," as used in Section 125.8(e), likewise prohibits imposing heightened, or more arduous, evaluation and responsibility criteria on protégé firms.  *See, e.g.*, SHS MJAR at 29 ("[T]he Agency is prohibited from holding protégés to the *same or heightened* evaluation requirement.") (emphasis in original); VCH MJAR at 29 (same); Oral Arg. Tr. at 72:5–12 (Court: "[W]ould you agree that it would not be okay to impose a heightened requirement on the protégés?" Defendant's Counsel: "[I]f that were the case here, then, right, we'd be violating 125.8(e).").

35

submit an individually completed Relevant Experience Project, Defendant contends that GSA has not imposed *any* requirement on the "protégé firm" individually that would violate Section 125.8(e). Cross-MJAR at 41. Further, Defendant emphasizes that the points scale included within the Solicitations measures the *offeror's* overall performance and does not individually assess the protégé firm in a manner that would violate Section 125.8(e). *Id.* at 46–48.

For the reasons stated below, this Court disagrees with Plaintiffs' assertion that the Polaris Solicitations violate 13 C.F.R. § 125.8(e) by requiring (1) the protégé firm or the mentor-protégé JV to submit an individually performed Relevant Experience Project, and (2) by allowing prime contractor offerors to submit projects performed by first-tier subcontractors to satisfy the Solicitations' Relevant Experience Requirement. However, this Court agrees with Plaintiffs that the Polaris Solicitations violate Section 125.8(e) by applying the same evaluation criteria both to projects submitted by protégés and to those projects submitted by offerors generally.

> A.   **GSA Did Not Violate SBA Regulations by (1) Requiring the Protégé or Mentor-Protégé JV to Submit an Individually Performed Relevant Experience Project, or (2) Allowing Prime Contractors to Rely on Projects Performed by First-Tier Subcontractors.**

Plaintiffs claim the Polaris Solicitations' requirements for evaluating Relevant Experience Projects creates a disparity between offerors that hinders protégé firms and violates 13 C.F.R. § 125.8(e). As noted, the Polaris Solicitations state: "For offers from SBA Mentor-Protégé joint ventures, a minimum of one Primary Relevant Experience Project or Emerging Technology Relevant Experience Project must be from the Protégé or the offering Mentor-Protégé Joint Venture. No more than three Primary Relevant Experience Projects may be provided by the Mentor." AR at 1088, 2127, 2619. However, the Solicitations do not contain an analogous provision requiring prime contractor offerors to submit individually performed projects. *See generally* AR at 1021–1144, 2060–2184, 2550–2674. Instead, the Solicitations permit prime

contractors to submit projects entirely performed by the first-tier subcontractors listed on the proposal.  S*ee* AR at 1090, 2129, 2620 (stating that, generally, "Relevant Experience Projects may be from the Offeror or any proposed subcontractor").  According to Plaintiffs, requiring the protégé or the mentor-protégé JV to submit an individually performed project, without placing the same requirement on prime contractor offerors, arbitrarily limits the field of projects available for submission by protégé firms.  SHS MJAR at 28–30; VCH MJAR at 28–30 (same).  This, Plaintiffs contend, violates Section 125.8(e) because it purportedly subjects protégés to heightened evaluation criteria as compared to offerors generally and makes it harder for mentor-protégé JVs to compete against more experienced firms with larger portfolios of past work.  SHS MJAR at 28–30; VCH MJAR at 28–30 (same).

        As noted, this Court applies the same interpretive rules to analyze both statutes and federal regulations.  *See Boeing*, 983 F.3d at 1327 (citing *Mass. Mut. Life Ins. Co.*, 782 F.3d at 1365); *see also supra* Discussion Section I.  It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Nielson v. Shinseki*, 607 F.3d 802, 807 (Fed. Cir. 2010) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, (2000)); *see Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1374 (Fed. Cir. 2022) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)) ("We do not look at the text in a vacuum, but rather, we must consider the words 'in their context and with a view to their place in the overall statutory scheme.'").  Therefore, this Court may not construe Section 125.8(e) in isolation and must instead interpret the provision as part of a "symmetrical and coherent regulatory scheme . . . fit[ting], if possible, all parts into [a] harmonious whole."  *Nielson*, 607 F.3d at 807 (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133) (internal quotation marks omitted).

In arguing the Polaris Solicitations create an illegal disparity between offerors based on the type of project each offeror may submit for evaluation, Plaintiffs ignore the broader regulatory regime governing small business procurements.  By SBA regulation, agencies "evaluating the capabilities, past performance, experience, business systems and certifications of . . . a joint venture [offeror] . . . must consider work done and qualifications held individually by each partner to the joint venture."  13 C.F.R. § 125.8(e); 15 U.S.C. § 644 (federal statute requiring agencies, "[w]hen evaluating an offer of a joint venture of small business concerns" for certain multiple award contracts, to "consider the capabilities and past performance of each member of the joint venture as the capabilities and past performance of the joint venture").[24]  As Plaintiffs acknowledge, the requirement to individually assess the capabilities of JV members applies equally to mentor-protégé JVs.  Oral Arg. Tr. at 27:23–28:1 (Plaintiffs' Counsel: "There's no question that the protégé has to submit its own experience. . . . We've never disputed that that is the case.").  Thus, both parties agree requiring a protégé firm to submit an individually performed project complies with Section 125.8(e).  *See, e.g.*, *id.*; Cross-MJAR at 42–44.

Plaintiffs' true concern, therefore, lies in the fact that the Polaris Solicitations allow prime contractor offerors to rely on subcontractor projects, giving prime contractors greater flexibility in the projects they may submit for evaluation.  Yet, Plaintiffs' position fails to acknowledge that another SBA Regulation, 13 C.F.R. § 125.2, mandates such flexibility for prime contractors.  Section 125.2, which governs the Polaris Solicitations as small business set-aside procurements,

---

[24] The GAO has affirmed that SBA regulations require agencies to evaluate the capabilities and experience of the individual members of a JV offeror, including mentor-protégé JVs.  *See, e.g.*, *AttainX, Inc.*, B-421216, B-421216.2, 2023 WL 1860802, at *7 (Comp. Gen. Jan. 23, 2023) ("SBA regulations require the agency to evaluate each joint venture member individually when the joint venture itself does not demonstrate it has the required experience; the agency does not have license to ignore SBA regulations in its evaluation.").  Though not binding on this Court, the GAO's decision is persuasive authority.

lists a "procuring agency's responsibilities when providing contracting assistance to small businesses." 13 C.F.R. § 125.2.  Specifically, Section 125.2(g) addresses how a procuring agency should treat projects completed by the first-tier subcontractors listed on an offeror's proposal, stating:

> When an offer of a small business prime contractor includes a proposed team of small business subcontractors and specifically identifies the first-tier subcontractor(s) in the proposal, the head of the agency must consider the capabilities, past performance, and experience of each first tier subcontractor that is part of the team as the capabilities, past performance, and experience of the small business prime contractor if the capabilities, past performance, and experience of the small business prime does not independently demonstrate capabilities and past performance necessary for award.

13 C.F.R. § 125.2(g).[25]  Said differently, if a prime contractor lacks the experience necessary for award, this provision requires the procuring agency to treat the experiences of first-tier subcontractors as if they belonged to the prime contractor.  *See* Oral Arg. Tr. at 67:24–68:1 (Defendant's Counsel: "GSA is obligated to consider and to take into account the first-tier subcontractor's experience under SBA regulations.").   Thus, the SBA's regulatory regime mandates the precise disparity that underlies Plaintiffs' concerns: Section 125.8(e) requires the agency to evaluate the individual performance of a mentor-protégé JV's protégé member, and Section 125.2(g) requires that the agency allow prime contractors to submit projects completely performed by subcontractors.  *See* 13 C.F.R. §§ 125.8(e), 125.2(g).  In navigating Sections 125.8(e) and 125.2(g), respectively, GSA drafted the Polaris Solicitations to (1) require protégé firms to submit one Relevant Experience Project for consideration, and (2) allow prime contractors to rely

---

[25] In their MJAR briefs, Plaintiffs originally argued that the Polaris Solicitations violated Section 125.2(g) by preventing mentor-protégé JVs from using subcontractor projects to fulfill all Relevant Experience Project requirements.  *See* SHS MJAR at 32–34; VCH MJAR at 32–34; Pl. Reply at 21–22.  However, at Oral Argument, Plaintiffs' counsel agreed with Defendant that Section 125.2(g) does not apply to mentor-protégé JVs.  *See* Oral Arg. Tr. at 33:13–19 ("[W]e do not believe that 125.2 applies to the . . . mentor-protégé joint venture . . . [, and] 13 CFR 125.8(e) is the rule that applies to mentor-protégé joint ventures.").

solely on Relevant Experience Projects completed by their first-tier subcontractors.  Any resulting disparity in the nature of the projects available for submission by different offerors does not reflect an arbitrary decision by the agency to disadvantage mentor-protégé JV offerors, but instead reflects a reasonable attempt to comply with the complex regulatory regime governing the procurement. Plaintiffs, therefore, are incorrect to assert that this aspect of the Polaris Solicitations violates Section 125.8(e).

> **B.     The Polaris Solicitations Violate Section 125.8(e) by Applying the Same Evaluation Criteria to Assess Relevant Experience Projects Submitted by Protégé Firms and by Offerors Generally.**

Plaintiffs next assert that by applying the same evaluation criteria for Relevant Experience to the projects submitted by all offerors, including protégé firms, the Polaris Solicitations violate the requirement in 13 C.F.R. § 125.8(e) that "[a] procuring activity may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of other offerors generally." 13 C.F.R. § 125.8(e); *see* SHS MJAR at 30–31; VCH MJAR at 30–31.[26]  To reiterate, under the Polaris Solicitations, GSA will award IDIQ contracts to the highest technically rated qualifying proposals based on how well the proposals score on the Solicitations' standardized points system.  *See* AR at 1112–13, 2152–53, 2643–44.  The same standardized point system is applicable to all offerors under the current Solicitations.  Offerors are awarded points based on how well their proposals comply with the Solicitations' four primary "evaluation factors": (1) Relevant Experience; (2) Past Performance; (3) Systems, Certifications, and Clearances; and (4) Risk Assessment.  *See* AR at 1112–18, 2152–58, 2643–49.  Underneath each evaluation factor, the Solicitations list additional sub-factors that the proposals must meet to earn maximum points.

---

[26] *See supra* note 23 (noting the parties agree that "the same evaluation or responsibility criteria," as used in Section 125.8(e), prohibits agencies from imposing heightened, or more onerous, criteria on protégé firms).

*See* AR at 1112–18, 2152–58, 2643–49.  For example, offerors can earn additional points for Relevant Experience by submitting (1) projects with high contract values; (2) projects completed for various government customers; (3) cost-reimbursement projects; (4) task order awards on multiple-award contracts; (5) projects outside the contiguous United States; (6) projects related to cybersecurity experience; (7) projects demonstrating a breadth of technological experiences; and (8) projects that demonstrate breadth of experience in emerging technology.  *See* AR at 1112–18, 2152–58, 2643–49.  Each of these sub-factors appears as an entry on the Solicitations' scoring tables, and GSA awards points based on the degree to which each submitted project satisfies each sub-factor.  *See* AR at 1112–18, 2152–58, 2643–49.  Offerors are then sorted into and out of the IDIQ pools based on their verified scores for all evaluation factors.  AR at 1113–14, 2153–54, 2644–45.

The parties disagree on whether the Polaris Solicitations as designed subject protégé firms to the same evaluation criteria for Relevant Experience as offerors generally, in contravention of Section 125.8(e).  Plaintiffs answer this question in the affirmative, on the basis that GSA intends to use the same evaluation factors and points table to evaluate all projects, including those submitted individually by the protégé firm.  *See* SHS MJAR at 30–31; VCH MJAR at 30–31. Plaintiffs express particular concern over the sub-factor applicable to Primary Relevant Experience Projects that provides offerors additional points based on a project's contract value.  *See* SHS MJAR at 30–31; VCH MJAR at 30–31.  According to Plaintiffs, this provision violates Section 125.8(e) because both protégé firms and offerors generally must submit projects with the same contract value, specifically $10 million, to receive maximum points for the project.  *See* SHS MJAR at 30–31; VCH MJAR at 30–31.  In contrast, Defendant argues the Polaris Solicitations do not require protégé firms to meet the same evaluation criteria as offerors generally because the

protégé firm must only submit one Relevant Experience Project, either Primary or Emerging Technology, whereas offerors generally must submit at least three Primary Relevant Experience Projects. Cross-MJAR at 38. For the reasons stated below, this Court agrees with Plaintiffs and holds that the Polaris Solicitations violate Section 125.8(e) by applying the same evaluation criteria to all Relevant Experience Projects, regardless of whether the project is submitted by a protégé firm or by offerors generally.

The plain language of 13 C.F.R. § 125.8(e) requires agencies to measure the individual capabilities of protégé members of mentor-protégé JVs using alternative evaluation criteria relative to offerors generally. *See* 13 C.F.R. § 125.8(e). Section 125.8 details the general requirements a JV must satisfy "to submit an offer for a procurement or sale set aside or reserved for small business." 13 C.F.R. § 125.8. Section 125.8(e) governs the way an agency must "evaluat[e] the capabilities, past performance, experience, business systems and certifications" of a joint venture offeror on a small business procurement. 13 C.F.R. § 125.8(e). The regulation begins by requiring agencies to evaluate not only the capabilities and experience of the JV offeror itself, but also the "work done and qualifications held individually by each partner to the joint venture." *Id.* The second sentence of Section 125.8(e) further elaborates that in individually evaluating each JV member, the agency "may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of other offerors generally." *Id.* Thus, the second sentence of Section 125.8(e) informs agencies how to comply with the requirements detailed in the Section's first sentence: in measuring the protégé firm's individual capabilities and experience, the agency must assess the protégé firm using different evaluation criteria than the criteria applied to other

offers generally.[27]  *See Obsidian Sols. Grp.*, 54 F.4th at 1374 (quoting *King*, 576 U.S. at 486) (urging courts to avoid interpreting text "in a vacuum" and to instead "consider the words 'in their context'").  Section 125.8(e) concludes by stating as long as "the joint venture in the aggregate . . . demonstrate[s] the past performance, experience, business systems and certifications necessary to perform the contract," the JV offeror is eligible for award.  13 C.F.R. § 125.8(e).

To determine the precise agency conduct prohibited by Section 125.8(e)'s second sentence, this Court must first interpret the plain meaning of "evaluation criteria."  *Boeing*, 983 F.3d at 1326 ("In construing a statute or regulation, we begin by reviewing its language to ascertain its plain meaning.") (quoting *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1299 (Fed. Cir. 2008)).  SBA regulations do not expressly define "evaluation criteria," so this Court once again consults the dictionary to determine the plain meaning of the term.  *See Mass. Mut. Life Ins. Co.*, 782 F.3d at 1367 (quoting *Am. Express*, 262 F.3d at 1381 n.5).  "Criteria" is the plural form of "criterion," which is defined as "a standard on which a judgment or decision may be based."  *Criterion*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  The term "evaluation" is used as an adjective to modify "criteria" and clarifies precisely which type of criteria the SBA intended to address in drafting Section 125.8(e): criteria used for evaluation.  To "evaluate" something means "to determine or fix the value of; to determine the significance, worth, or condition of usu[ally] by careful appraisal and study."  *Evaluate*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003);

---

[27] Such a reading is consistent with how Defendant has described the application of Section 125.8(e).  *See* Cross-MJAR at 40–41 ("SBA's regulations, specifically at § 125.8(e), provide that, when evaluating the experience '*of an entity submitting an offer* for a contract set aside or reserved for small business as a joint venture,' the procuring agency must consider the work and qualifications of each partner to the joint venture.  13 C.F.R. § 125.8(e).  And in that context, a procuring agency 'may not require the protégé firm to individually meet the same evaluation or responsibility criteria as that required of *other **offerors** generally*.'  *Id.*  Thus, the regulation's prohibition bars the *protégé **individually** f*rom being required to meet the same evaluation as *other **offerors**.*") (emphases in original).

*see Evaluation*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/evaluation (last visited Mar. 30, 2023) ("[T]he act or result of evaluating; . . . [a] determination of the value, nature, character, or quality of something or someone.").  Thus, by its plain meaning, "evaluation criteria" as used in the second sentence of Section 125.8(e) addresses the standards with which an agency intends to "determine or fix the value . . . [,] significance, worth, or condition" of a protégé firm's "capabilities, past performance, experience, business systems and certifications."  *Evaluate*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); 13 C.F.R. § 125.8(e).

Based on this understanding of "evaluation criteria," the Polaris Solicitations violate Section 125.8(e).  To comply with Section 125.8(e)'s requirement that agencies assess the individual capabilities of each JV member, the Solicitations require protégé firms to submit one individually performed Relevant Experience Project for evaluation.  S*ee* AR at 1088, 2127, 2619; 13 C.F.R. § 125.8(e).  The Polaris Solicitations indicate that "[t]he Government will evaluate proposals in accordance with the instructions and *evaluation criteria* set forth in Sections L and M of this solicitation."  AR at 1085, 2124, 2614 (emphasis added).  Section L lists the four scored evaluation factors each proposal must satisfy (Relevant Experience; Past Performance; Systems, Certifications, and Clearances; and Risk Assessment) and defines various sub-factors offerors may demonstrate to earn maximum points for each primary evaluation factor (e.g., contract value, breadth of relevant experience, experience with multiple government customers, etc.).  AR at 1083–1111, 2122–51, 2613–42.  Section M reiterates the "evaluation factors for award," describes the Polaris Solicitations' evaluation procedures, and includes a scoring table that allocates points to each evaluation factor and sub-factor introduced in Section L.  AR at 1112–19, 2152–59, 2643–

50.[28]   However, the Solicitations do not incorporate distinct evaluation criteria that offerors and GSA should use to evaluate the protégé firm's individual project.  Instead, in evaluating and awarding points for the protégé's Relevant Experience Project, GSA intends to use the same evaluation criteria, or the same evaluation sub-factors and scoring table, to assess every project submitted for consideration, including that of the protégé.  This is precisely the circumstance that Section 125.8(e) precludes.[29]

---

[28] The terms "evaluation factor" and "evaluation subfactor" appear frequently throughout federal procurement statutes, SBA regulations, and the FAR to describe the criteria used to evaluate procurements.  *See, e.g.*, 41 U.S.C. § 3306(c)(1) (titled "Evaluation factors," and stating "[i]n prescribing the evaluation factors to be included in each solicitation for competitive proposals, an executive agency shall . . . establish clearly the relative importance assigned to the evaluation factors and subfactors, including the quality of the product or services to be provided (including technical capability, management capability, prior experience, and past performance of the offeror)"); 13 C.F.R. § 125.2(b)(1)(iii)(D) (discussing "evaluation factors" for "evaluating the offerors' proposed approach to small business subcontracting participation").  For example, FAR 15.304 is titled "Evaluation factors and significant subfactors" and is included among the FAR provisions outlining the source selection procedures for competitive negotiated acquisitions.  *See* FAR 15.304.  The provision states that "[t]he award decision is based on evaluation factors and significant subfactors that are tailored to the acquisition."  FAR 15.304(a).  "Evaluation factors and significant subfactors must . . . [r]epresent the key areas of importance and emphasis to be considered in the source selection decision; and . . . [s]upport meaningful comparison and discrimination between and among competing proposals."  FAR 15.304(b).  Likewise, FAR 15.305(a), which addresses "Proposal evaluation" for competitive negotiated acquisitions, states: "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.  Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings."  FAR 15.305(a).  Finally, FAR 15.306(c), which discusses the establishment of a competitive range in competitive negotiated procurements, states that "[a]gencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range.  Based on the ratings of each proposal against all *evaluation criteria*, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals . . . ."  FAR 15.306(c)(1) (emphasis added).  This last provision draws a direct link between the term "evaluation criteria" and the specific "evaluation factors" and "evaluation subfactors" included in solicitations that agencies use to make source selection decisions.

[29] Though not binding on this Court, statements made by GAO in *Innovate Now* are instructive in their concision: "The plain language of the regulation is clear; a procuring agency may not require a protégé firm to individually meet the same evaluation requirements as those imposed on other offerors."  *Innovate Now, LLC*, B-419546, 2021 WL 1610896, at *2 (Comp. Gen. Apr. 26, 2021).

Defendant argues that the Polaris Solicitations do not subject protégé firms to the same evaluation criteria as other offerors purely because protégés must only submit one Relevant Experience project, whereas other offerors must submit at least three Primary Relevant Experience Projects.  Cross-MJAR at 38.  However, this assertion glosses over the way in which GSA intends to evaluate Relevant Experience Projects under the Solicitations.  To self-score their proposals for Relevant Experience, offerors (with later verification by GSA) assess *each* Relevant Experience Project on an individual basis to determine how well *each* project satisfies the Solicitations' various evaluation requirements.  *See* AR at 1113–18, 2153–58, 2644–49.  Points are awarded to an offeror for each sub-factor that the offeror's projects satisfy.  *See* AR at 1113–18, 2153–58, 2644–49.  The points, therefore, offer a numerical representation of the degree to which each project fulfills the terms of the Solicitations.

Some points are awarded based on a project's individual compliance with certain sub-factors on the scoring table.  For example, "[f]or each Relevant Experience Project submitted under L.5.2.2, the Offeror will receive additional points if the Project is a task order awarded against a Federal Government multiple-award contract . . . ."  AR at 1099, 2138, 2630.  Thus, each project submitted can earn additional points simply by virtue of being a task order on another multiple-award contract.  A similar situation exists for the sub-factor designed to evaluate each project's size.  AR at 1098, 2137, 2628.  Under the Solicitations, "[f]or each Relevant Experience Project submitted under L.5.2.2, the Offeror will receive additional points for Project values as specified in Section M.6, Polaris Scoring Table."  AR at 1098, 2137, 2628.  Below is a depiction of the scoring table for the project size sub-factor.  *See* AR at 1116, 2156, 2647.

| L.5.2.2.2 | Project Size | | | | |
|---|---|---|---|---|---|
| | Project with a value greater or equal to $1 Million, but less than $5 Million | 500 | 5 | 2,500 | |
| | Project with a value greater or equal to $5 Million, but less than $10 Million | 1,500 | 5 | 7,500 | 15,000 |
| | Project with a value equal to or greater than $10 Million | 3,000 | 5 | 15,000 | |

Under the scoring table, an offeror can earn a greater number of additional points toward its total score by submitting projects with larger contract values. Thus, each project with a value of $1 million would earn the offeror an additional 500 points for Relevant Experience, whereas each project with a value of $10 million would earn an additional 3,000 points. *See* AR at 1116, 2156, 2647. As the graphic demonstrates, an offeror can add an additional 15,000 points out of the 95,000 total points just by submitting projects with high contract values.

In other cases, offerors earn points toward their total Relevant Experience score based on the total number of projects an offeror submits that successfully demonstrate a specific evaluation criterion. This is the case for the sub-factor that assesses the offeror's experience working with various federal government customers. Below is a depiction of the scoring table for this sub-factor. *See* AR at 1117, 2157, 2648.

| L.5.2.2.3 | Demonstrating Experience with Multiple Federal Government Customers (Federal Government Customer is determined by the Funding Agency ID identified within the FPDS-NG Report) | | | | |
|---|---|---|---|---|---|
| | Two Unique Federal Government Customers | 500 | 1 | 500 | |
| | Three Unique Federal Government Customers | 1,000 | 1 | 1,000 | |
| | Four Unique Federal Government Customers | 1,500 | 1 | 1,500 | 2,000 |
| | Five Unique Federal Government  Customers | 2,000 | 1 | 2,000 | |

Under the Solicitations, an offeror can earn added points "for each additional unique Federal Government Customer represented beyond the first unique Federal Government Customer." *See* AR at 1098, 2137, 2629. Thus, an offeror whose projects include two unique government

customers can earn 500 additional points, whereas an offeror whose projects include five unique government customers can earn 2,000 additional points.  AR at 1098, 2137, 2629.  A similar regime applies to the sub-factor assessing the breadth of an offeror's relevant experience.  *See* AR at 1100, 2139, 2631 ("The Offeror will receive additional points for each additional [North American Industry Classification System] area with demonstrated relevant experience.").

By focusing its argument on the *number* of projects protégé firms must submit relative to offerors generally, Defendant ignores the crucial point that the same evaluation methods and criteria apply to *all projects*, regardless of whether the project is submitted by a protégé or another offeror.  The evaluation process under the Polaris Solicitations occurs on a project-by-project basis.  Under either scoring method described above, protégé firms and prime contractors alike must assess whether each project, on its own, meets the Solicitations' desired evaluation sub-factors and award points accordingly.  Therefore, though the protégé firm need only submit one Relevant Experience Project under the Polaris Solicitations, that single protégé project will be evaluated in precisely the same manner, and based on precisely the same criteria, as all other projects submitted under the Polaris Solicitations.  Thus, the Polaris Solicitations convey the expectation that the protégé firm's Relevant Experience Project should be able to demonstrate the same contract value, the same breadth of relevant or emerging technology experience, and the same variety of government customers as projects submitted by offerors generally.  This is the exact scenario Section 125.8(e) prohibits.  GSA cannot avoid violating Section 125.8(e) simply by reducing the minimum number of projects the protégé firm must submit when the tools, methods, and criteria used to evaluate the protégé firm's project are "the same . . . as that required of other offerors generally." 13 C.F.R. § 125.8(e).  Such a regime conflicts with the plain language of Section

125.8(e), which prohibits agencies from requiring protégé firms to "meet the same evaluation . . .

criteria" as other offerors generally.[30]  13 C.F.R. § 125.8(e).

That the Polaris Solicitations allow either the protégé or the offering mentor-protégé JV to

submit an individually performed project for consideration does not alter this Court's analysis.

The terms of the Polaris Solicitations blur the line between a Relevant Experience Project

submitted by the protégé firm and one submitted by the offering mentor-protégé JV.  Specifically,

the Solicitations include a provision instructing the agency that "[a]n Offeror (to include members

of a joint venture and proposed subcontractors) may use experience performed as a member of a

joint venture" to fulfill the Solicitations' Relevant Experience requirements.  AR at 1090, 2129,

---

[30] Defendant suggests the fact that protégé firms may submit either a Primary Relevant Experience
Project or an Emerging Technology Relevant Experience Project prevents the Polaris Solicitations from
violating Section 125.8(e).  *See* Cross-MJAR at 47 ("Notably, GSA does not require that the
required protégé project be one of the five Primary Relevant Experience projects. . . . [T]he
protégé's requirement can be met via submission of one of three optional Emerging Technology
projects performed by the protégé or the offering Joint Venture itself."); Oral Arg. Tr. at 62:11–15
(Defendant's Counsel: "The protégé doesn't have to show up with one primary experience.  It
doesn't have to show up with the experience of doing a project.  It can show up with just having
an expertise in quantum computing.").  Implicit in Defendant's statements is the notion that the
choice between submitting either a Primary or Emerging Technology Relevant Experience Project
somehow introduces flexibility for protégés and represents a less stringent evaluation criterion
than applied to offerors generally.  However, these sentiments are belied by statements made by
Defendant's Counsel during Oral Argument that acknowledge the rarity among small business
contractors of projects demonstrating emerging technologies.  *See, e.g.*, Oral Arg. Tr. at 49:20–
50:6 ("[V]ery few offerors will be able to obtain the maximum amount of emerging technology
experience points given the very nature of these emerging technologies. . . . The emerging
technology experiences included past experience with artificial intelligence, edge computing,
immersive technology, advanced and quantum computing.  So that's right.  Not everybody is going
to be able to do it.  A small business, they're not all going to be [able to] do that.").  Nevertheless,
regardless of the inherent difficulties in claiming Emerging Technology Relevant Experience, the
criticisms articulated in this Court's Memorandum and Order apply to the Polaris Solicitations'
evaluation of all Relevant Experience Projects, whether Primary or Emerging Technology: the
Solicitations contemplate applying the same evaluation criteria to all Relevant Experience Projects
submitted by protégé firms and other offerors alike.  The choice to hold a protégé firm's Relevant
Experience Projects to the same standards as projects submitted by offerors contradicts Section
125.8(e) and accordingly is contrary to law.

2621.  Accordingly, under the terms of the Solicitations, the protégé may already claim any project performed by the offering mentor-protégé JV as its own Relevant Experience Project.  *See* Pl. Reply at 19 n.5.  ("[T]he requirement that either the protégés [sic] mentor-protégé joint venture or its protégé submit a Relevant Experience project is an empty distinction because if the protégé's joint venture already had that experience, the protégé would still be able to claim it on its own under the terms of the Solicitations.").  Though the Solicitations appear to offer mentor-protégé JVs a choice, the choice is rhetorical rather than functional: allowing mentor-protégé JV offerors to submit projects performed by "the offering Mentor-Protégé Joint Venture" does nothing to change or expand the field of available projects eligible for submission.  AR at 1088, 2127, 2619. Either way, the protégé firm's project is subject to evaluation by the agency, and that project is assessed against the same evaluation criteria used to evaluate projects submitted by offerors generally.  As Plaintiffs' counsel aptly stated during Oral Argument, the Solicitations' terms offer "a distinction without a difference."  Oral Arg. Tr. at 28:23–24.

For the Polaris procurement to proceed, the agency must adjust the evaluation criteria it applies to assess a protégé firm's Relevant Experience Project.  Agencies "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process" so long as agency choices comply with existing law.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); *see* FAR 1.102(d) (granting agencies discretion to design procurements in the best interests of the agency and within the bounds of the law).  Thus, this Court need not prescribe the precise changes GSA must adopt going forward.  Instead, this Court only offers suggestions for alternative evaluation methods that would address the defects identified in the current Solicitations, consistent with applicable law.

For example, as Plaintiffs have suggested, GSA could award protégé firms maximum points for projects with smaller contract values.  *See* Oral Arg. Tr. at 34:7–11 ("One way, for example, would be to reduce the value of the contracts for the mentor-protégé or protégé.  So it doesn't have to be ten million to get the maximum points, it would have to be one million.").  Another alternative could be to award a small point premium to protégé projects for each evaluation criterion satisfied.  Finally, as a third and perhaps more sweeping adjustment, GSA could allow the protégé firm's project to be submitted *in addition to* the three to five Primary Relevant Experience Projects and the potentially three Emerging Technology Relevant Experience Projects already contemplated under the Solicitations.  This project could then be evaluated on a pass/fail basis based on whether the project complies with the Solicitations' evaluation criteria and demonstrates the necessary experience to fulfill the protégé firm's 40% performance requirement contained in 13 C.F.R. § 125.8(c).  *See* 13 C.F.R. § 125.8(c)(1) ("[T]he small business partner to the joint venture must perform at least 40% of the work performed by the joint venture.").  However, whatever adjustments GSA makes to the evaluation criteria applicable to the protégé may not force protégé firms to experience a heightened or more onerous burden than what offerors generally face.  *See* 13 C.F.R. § 125.8(e); *see*, *e.g.*, SHS MJAR at 29 ("[T]he Agency is prohibited from holding protégés to the *same or heightened* evaluation requirement.") (emphasis in original); VCH MJAR at 29 (same); Oral Arg. Tr. at 72:5–12 (Court: "[W]ould you agree that it would not be okay to impose a heightened requirement on the protégés?" Defendant's Counsel: "[I]f that were the case here, then, right, we'd be violating 125.8(e).").  Indeed, such a change would be inconsistent with the express goal of the Mentor-Protégé Program "to improve the protégé firms' ability to successfully compete for federal contracts."  13 C.F.R. § 125.9(a).

51

For the reasons set forth above, this Court agrees with Plaintiffs that the Polaris Solicitations as currently drafted violate 13 C.F.R. § 125.8(e) by applying the same evaluation criteria to projects submitted by protégé firms and other offerors alike.  Should Defendant proceed with the Polaris procurement, it must amend the current Solicitations to comply with 13 C.F.R. § 125.8(e), in a manner consistent with this Memorandum and Order.

### III.   The Polaris Solicitations Violate Federal Procurement Law by Inappropriately Relying on 41 U.S.C. § 3306(c)(3) to Exclude Price as an Evaluation Factor at the IDIQ Level.

In their third claim, Plaintiffs argue GSA's decision not to evaluate price at the IDIQ level under the Polaris Solicitations violates federal procurement statute 41 U.S.C. § 3306(c).  *See* SHS MJAR at 34–37; VCH MJAR at 34–37; *see also* 41 U.S.C. § 3306(c)(1)–(3).  To reiterate, 41 U.S.C. § 3306(c)(1)(B) requires agencies to "include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals" for every procurement "except as provided in paragraph (3)."  41 U.S.C. § 3306(c)(1)(B).  In 41 U.S.C. § 3306(c)(3), Congress carved out a narrow exception to the general rule requiring price evaluations for "certain indefinite delivery, indefinite quantity multiple-award contracts . . . . for services acquired on an hourly rate basis" that will "feature individually competed task or delivery orders based on hourly rates."  41 U.S.C. § 3306(c)(3).  For such a procurement, the procuring agency need only evaluate "cost or price to the Federal Government . . . in conjunction with the issuance . . . of any task or delivery order," rather than at the IDIQ level.  41 U.S.C. § 3306(c)(3)(B).  GSA issued Class Deviation CD-2020-14 on August 14, 2020, to informally amend the language in FAR Subpart 16.5, which addresses IDIQ contracts, to adopt the exception found in Section 3306(c)(3).  *See* Class Deviation CD-2020-14.  Accordingly, on March 18, 2022, GSA approved the Polaris Solicitations for application of Class Deviation CD-2020-14, affirming GSA's ability to exclude

price as an evaluation factor for the IDIQ contracts issued under the Polaris Solicitations. *See* Supplement 2, AR at 2904.

Plaintiffs assert that in designing the Polaris Solicitations, GSA relied on an erroneous interpretation of 41 U.S.C. § 3306(c)(3) that ignores the statute's plain and unambiguous language. SHS MJAR at 35–36; VCH MJAR at 35–36. Plaintiffs argue that Defendant has adopted an overly broad interpretation for when a contract qualifies as being "based on hourly rates." *See* SHS MJAR at 36–37; VCH MJAR at 36–37. Plaintiffs aver that under the statute's plain language, a contract only qualifies as "based on hourly rates" when services are procured and paid using hourly rates, which is only the case for time-and-materials and labor-hour contracts. *See* SHS MJAR at 36–37; VCH MJAR at 36–37. According to Plaintiffs, because the Polaris Solicitations contemplate task order contract types other than time-and-materials and labor-hour contracts — such as fixed-price, cost-reimbursement, and incentive contracts — the Polaris Solicitations are ineligible for the exception housed in Section 3306(c)(3) and must instead evaluate price at the IDIQ level. *See* SHS MJAR at 36–37 (criticizing the Solicitations' inclusion of fixed-price, incentive, and cost reimbursement contract types); VCH MJAR at 36–37 (same). Further, Plaintiffs emphasize that any practical justifications offered by Defendant for applying the Section 3306(c)(3) exception to the Polaris Solicitations cannot override the plain and unambiguous language of Section 3306(c)(3), which clearly requires contracts and task orders "based on hourly rates." *See* Pl. Reply at 23 ("The statute is unambiguous, and an unambiguous statute must be read according to its terms."); Oral Arg. Tr. at 40:25–41:3 (The Court: "Do you think the statute is ambiguous?" Plaintiffs' Counsel: "We don't. We think that 'based on hourly rates' can only mean one thing.").

Defendant disagrees with Plaintiffs' interpretation of 41 U.S.C. § 3306(c)(3) and asserts GSA properly exercised its discretion in designing the Polaris Solicitations to exclude price as an

evaluation factor at the IDIQ level.  Cross-MJAR at 51–58.  Defendant argues the term "hourly rates" as used in Section 3306(c)(3) "does not directly correlate with a specific contract type in the FAR" and is not limited to "labor hour" contracts.  *Id.* at 55.  According to Defendant, the Polaris Solicitations qualify for the Section 3306(c)(3) exception because the Solicitations' approved task order types are all based upon "hourly rate build-up[s]."  *Id.* at 54–55.  Defendant further argues GSA reasonably determined task orders for such a large government procurement should not be "limited to contracts whose *only payment structure* is based upon an hourly-rate assessment of service . . . but should instead include the possibility for multiple types of task orders, each of which would have a component in the payment structure that includes, *predominantly*, the payment of hourly-rate costs."  *Id.* at 52–53 (emphasis in original).  "[G]iven the scope of IT-related services meant to fall under the $60 billion to $100 billion Polaris GWAC," Defendant argues Plaintiffs set "forth an interpretation of the hourly-rate requirement . . . that is unreasonable."  *Id.* at 52.

This Court ultimately agrees with Plaintiffs, though its reasoning and conclusions do not extend as far as Plaintiffs urge.  Defendant adopted an overly broad interpretation of 41 U.S.C. § 3306(c)(3) that does not reflect the statute's plain and unambiguous language.  Thus, the Polaris Solicitations violate federal procurement law because they do not adequately "feature" task orders "based on hourly rates," as contemplated under 41 U.S.C. § 3306(c)(3).

### A.   Defendant Has Adopted an Unreasonable Interpretation of "Based on Hourly Rates" as Used in 41 U.S.C. § 3306(c)(3).

Central to the parties' dispute is a difference in opinion over what "task or delivery orders based on hourly rates" means within the context of 41 U.S.C. § 3306(c)(3).  Plaintiffs suggest task orders "based on hourly rates" are contracts for services that are procured or purchased using hourly labor rates.  *See* SHS MJAR at 35–36; VCH MJAR at 35–36.  Said another way, Plaintiffs contend performance under the task order must be measured by, and payment remitted in

accordance with, the number of hours a contractor spends working on the project to be consistent

with Section 3306(c).  Therefore, according to Plaintiffs, the only task order types appropriate for

use under Section 3306(c)(3) are time-and-materials contracts and labor-hour contracts.  *See* SHS

MJAR at 36–37 (criticizing all the Solicitations' approved contract types except the time-and-

materials and labor-hour contract types); VCH MJAR at 36–37 (same).  In contrast, Defendant

takes issue with Plaintiffs' assertion that "hourly rates" inherently implicates labor hours.  *See*

Cross-MJAR at 55–56 (arguing Plaintiffs have incorrectly "swapp[ed] the statutory phrase 'hourly

rates' for the much more precise 'labor hour'").  Defendant suggests that a task order is "based on

hourly rates" if the task orders are "based upon an hourly rate build up."[31]  Cross-MJAR at 54–55;

AR at 2907–08.  Thus, according to Defendant, task orders qualify for the Section 3306(c)(3)

exception so long as "hourly rates for labor costs are . . . embedded in the contractor's bid amount."

Cross-MJAR at 57.  Defendant asserts that "hourly rates can certainly be embedded within" all

task order contract types referenced in the Polaris Solicitations.  *Id.*

---

[31] Defendant does not provide a clear definition for its reference to an "hourly rate build up."  *See generally* Cross-MJAR at 51–58; Def. Reply at 23–24.  In applying the customary understanding of the term, this Court presumes that in using the phrase "hourly rate build-up," Defendant references a contractor's "cost build-up," which is a tool that businesses may use to assist with pricing out products and services.  *See, e.g.*, Charles H. Brandon, *Management Accounting* 353 (McGraw-Hill 1997) (describing the concept of a cost build-up within the context of car manufacturing).  Businesses prepare cost build-ups to estimate total direct and indirect costs attributable to a future project.  *Id.*  This data informs a business's decision on which price it should offer to maintain a reasonable profit margin.  *Id.*  Cost build-ups can be unitized, meaning the total estimated costs attributable to a project are divided by the project's unit of delivery.  *See, e.g.*, *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 433–34 (6th Cir. 1980) ("A build-up of standard costs involves an estimate of costs per unit of goods . . . .").  Thus, for a services acquisition where the unit of delivery is based on labor hours, contractors estimate cost based on an hourly rate.  Government agencies may request, as a term included in the solicitation, that offerors disclose data on cost with their proposals so the agency may perform realism analyses to "ensure that the final agreed-to price is fair and reasonable."  FAR 15.404-1.

As a threshold matter, this Court must determine what deference, if any, this Court should afford GSA's interpretation of 41 U.S.C. § 3306(c)(3).  This Court need not defer to Defendant's interpretation of Section 3306(c)(3) if, after employing all "traditional tools of statutory construction," the Court determines "Congress has directly spoken to the precise question at issue." *Aqua Products, Inc. v. Matal*, 872 F.3d 1290, 1302–03 (Fed. Cir. 2017) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984)).  If that is not the case, and "the statute is silent or ambiguous with respect to the specific issue," this Court must then "determine 'whether the agency's answer is based on a permissible construction of the statute.'" *Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357, 1360–61 (Fed. Cir. 2022) (quoting *Chevron*, 467 U.S. at 843).  Thus, GSA's interpretation of 41 U.S.C. § 3306(c)(3) may only govern "in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Aqua Products*, 872 F.3d at 1302–03 (quoting *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009)).  For the reasons discussed further below, this Court finds that the language of 41 U.S.C. § 3306(c) is unambiguous and directly supports Plaintiffs' interpretation of the phrase "task or delivery orders based on hourly rates" as found in Section 3306(c).

Once again, this Court begins its interpretive inquiry by reviewing the plain language of the statute.  *Boeing*, 983 F.3d at 1326 (quoting *Am. Airlines*, 551 F.3d at 1299).  "Based on hourly rates" is a postpositive adjectival phrase that modifies the terms "task or delivery orders" in 41 U.S.C. § 3306(c)(3).  *See* 41 U.S.C. § 3306(c)(3).  A "modifier" is a "word or phrase that makes specific the meaning of another word or phrase." *Modifier*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see Modifier*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/modifier (last visited Mar. 12, 2023)

(defining "modifier" as "a word or phrase that is used with another word or phrase to limit or add to its meaning").  In other words, postpositive adjectival modifiers contribute to or clarify the meaning of the nouns which appear immediately before them.  Thus, by including the phrase "task or delivery orders" immediately before the phrase "based on hourly rates," Congress has unambiguously expressed its intent to limit the type of task orders eligible for the exception in Section 3306(c)(3) to only those "based on hourly rates."  *See* 41 U.S.C. § 3306(c)(3).  The phrase "based on hourly rates" as used in Section 3306(c)(3) includes the transitive verb form of "base," which means "to make, form, or serve as a base for[;] . . . to find a base or basis for — usu[ally] used with *on* or *upon*."  *Base (vt)*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) (emphasis in original).  In turn, the noun form of "base" is defined as "the fundamental part of something."  *Base (n)*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  Something is "fundamental" if it is "of central importance."  *Fundamental*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).

Plaintiffs' interpretation that "task or delivery orders based on hourly rates" references time-and-materials and labor-hour contracts comports with the plain meaning of the statutory text in Section 3306(c).  As the above definitions convey, for a task order to be "based on hourly rates," hourly rates must be a "fundamental part of," or "of central importance" to, the task order.  *Base (n)*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *Fundamental*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  It is not enough, therefore, that hourly rates are merely "embedded in the contractor's bid amount," as the same could be said for many different types of costs.  Cross-MJAR at 57; *see, e.g.*, *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1343 (Fed. Cir. 2014) ("[T]he mechanism of pricing such jobs involves identification of costs for those jobs, including labor, equipment, and materials . . . .").  "A time-and-materials contract

provides for acquiring supplies or services *on the basis of* . . . [d]irect labor hours at specified fixed *hourly rates* that include wages, overhead, general and administrative expenses, and profit . . . ." FAR 16.601(b) (emphasis added).  "A labor-hour contract is a variation of the time-and-materials contract, differing only in that materials are not supplied by the contractor."  FAR 16.602.  Thus, hourly rates are a "fundamental part of," or "of central importance" to, time-and-materials and labor-hour contracts because the services are procured and paid for using hourly rates.  *Base (n)*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *Fundamental, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); s*ee* FAR 16.601(b); FAR 16.602.

In contrast, Defendant's interpretation of 41 U.S.C. § 3306(c)(3) does not reflect the statute's plain language because it relies on terms absent from the statute and, if adopted, would render the phrase "based on hourly rates" superfluous.  As an initial matter, all parties agree that the statute at issue is unambiguous in nature.  Indeed, during Oral Argument, Defendant's counsel confirmed Defendant's view that the terms of 41 U.S.C. § 3306(c)(3) are unambiguous.  *See* Oral Arg. Tr. at 76:21–77:4 (The Court: "Do you think 3306(c)(3) is ambiguous?" . . . Defendant's Counsel: "I don't think so in the sense that you don't see the term 'labor hour' in there.  What you see is [']hourly rates['] and you also see. . . [']feature individually competed tasks or delivery orders based on hourly rates.[']"); s*ee* Pl. Reply at 23 ("The statute is unambiguous, and an unambiguous statute must be read according to its terms."); Oral Arg. Tr. at 40:25–41:3 (The Court: "Do you think the statute is ambiguous?"  Plaintiffs' Counsel: "We don't.  We think that 'based on hourly rates' can only mean one thing.").  Yet, Defendant suggests that the phrases "based on hourly rates" and "based on an hourly rate build up" are interchangeable.  Cross-MJAR at 54–55; AR at 2907–08 █████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ (emphasis added).  They are not.  The

term "build up," for example, does not appear anywhere within the statutory language of 41 U.S.C.

§ 3306.  *See* 41 U.S.C. § 3306.  Likewise, Defendant does not cite any persuasive authority to

suggest this Court should read the term "build-up" into the statute when Congress has not opted to

expressly include such a term in the statute.[32]   Cross-MJAR at 51–58; Def. Reply at 23–24.

Judicial engraftment of a term into a federal statute is outside the constitutional role of this Court.

Perhaps equally problematic is that Defendant's interpretation of which contract types

qualify as "based on hourly rates" is so broad that it renders the phrase "based on hourly rates"

entirely meaningless.    Defendant suggests every contract type referenced in the Polaris

Solicitations can qualify as "based on hourly rates" because each contract type is "based on an

hourly rate build up" and includes labor costs within the bid amount.  *See* Cross-MJAR at 57

("[H]ourly rates can certainly be embedded within and central to all of these types of contracts.").

---

[32] Defendant cites two cases to support its argument that "task or delivery orders based on hourly rates" includes any contract "based on an hourly rate build-up."  *See* Cross-MJAR at 57 (citing *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1346–48 (Fed. Cir. 2014) and *Cleveland Telecoms. Corp. v. United States*, 39 Fed. Cl. 649, 653–54 (1997)).   However, these cases merely stand for the unremarkable proposition that contractors working under firm fixed-price contracts must bear the risk that actual costs, which includes the cost of labor, may exceed the firm-fixed price agreed to under the contract.  *See Lakeshore Eng'g Servs.*, 748 F.3d at 1349 (acknowledging "the fundamental decision in this fixed-price contract that the contractor, not the government, would bear the risk of any inaccuracy in the pre-contract prices used for bidding . . . and of post-contract changes in market prices for the contractor's inputs"); *Cleveland Telecoms.*, 39 Fed. Cl. at 653 ("[T]he contractor in a firm fixed-price contract assumes the risk of other unexpected costs . . . .").  This notion, however, does not mean that hourly rates are a "fundamental part" of, or "of central importance" to, fixed-price contracts.  *Base (n), Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *Fundamental, Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  While Defendant correctly identifies that labor costs are often contemplated in pricing firm fixed-price contracts, the same is true for a wide variety of other costs.  *See, e.g.*, *Lakeshore Eng'g Servs.*, 748 F.3d at 1343 ("[T]he mechanism of pricing such jobs involves identification of costs for those jobs, including labor, equipment, and materials . . . .").

If this were the case, Congress need not have included the modifier "based on hourly rates" in the first instance: the phrase would offer no limiting or clarifying principle to the meaning of the noun it modifies, "task or delivery orders."  In other words, under Defendant's interpretation, the phrase "based on hourly rates" would no longer perform any function within the statute and would become redundant.  This Court declines to adopt an interpretation of Section 3306(c)(3) that would render portions of the statutory text redundant or superfluous.  *Kungys*, 485 U.S. at 778 (acknowledging the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"); *Shea*, 976 F.3d at 1300.

Rendering the phrase "based on hourly rates" meaningless, as Defendant's interpretation seeks to do, would broaden the scope of the exception in Section 3306(c)(3) beyond what Congress had intended.  The statute's plain language unambiguously demonstrates Congress's intent to create a narrow exception to the general rule requiring agencies to evaluate price for competitive procurements.  Section 3306(c) opens by describing, "[i]n general," the evaluation factors "to be included in each solicitation for competitive proposals."  41 U.S.C. § 3306(c)(1).  Section 3306(c)(1)(B) establishes that, "*except* as provided in paragraph (3)," agencies must include cost or price to the government as an evaluation factor in all procurements.  41 U.S.C. § 3306(c)(1)(B) (emphasis added); *see* 41 U.S.C. § 3306(c)(1)(C) (noting that "*except* as provided in paragraph (3)," agencies must disclose the relative importance of all evaluation factors as compared to cost or price to the government) (emphasis added).  Section 3306(c)(3)'s plain language clearly demonstrates that the provision provides an "exception[] for *certain* indefinite delivery, indefinite quantity multiple-award contracts:" those for "services to be acquired on an hourly rate basis."  41 U.S.C. § 3306(c)(3) (emphasis added).  By correspondingly requiring task orders featured under

the IDIQ to be "based on hourly rates," Congress underscored the limited subset of IDIQ contracts that would qualify for special treatment under Section 3306(c)(3).  *Id.*

Yet, as Plaintiffs emphasize, Defendant's interpretation ignores these textual cues that signal the narrow scope of Section 3306(c)(3), permitting the exception to swallow the rule.  *See* Oral Arg. Tr. at 40:9–12 ("[T]he actual rule that contains an exception would not have any purpose at that point.  So the exception swallows the rule.").  This Court agrees.  Taking Defendant's proposed interpretation to its logical conclusion would allow agencies to avoid evaluating price for *any* IDIQ contract for services, regardless of the manner in which the services are acquired. *See* Oral Arg. Tr. at 89:17–23 (Plaintiffs' Counsel: "[I]f we were to accept the Government's position on the statute, . . . what the statute would say is there's a special rule for IDIQ contracts, and it differs from the primary rule that you have to consider price. . . . And that's not how the statute reads.").  This interpretation and result are untenable.

Further, a study of FAR provisions cited in the Solicitations reveals Defendant's assertion that "the term 'hourly rate' does not directly correlate with any specific contract type in the FAR" is simply incorrect.  Cross-MJAR at 55; *see* Oral Arg. Tr. at 81:1–3 (calling "hourly rates" a "general term").  The Solicitations list five allowable contract types for task orders and state the FAR provisions associated with each contract type: fixed-price contracts (FAR Subpart 16.2); cost-reimbursement contracts (FAR Subpart 16.3); incentive contracts (FAR Subpart 16.4); time-and-materials contracts (FAR 16.601); and labor-hour contracts (FAR 16.602).  AR at 1025, 2064, 2554.  Of the task order contract types listed in the Solicitations, only the FAR provisions for time-and-materials and labor-hour contracts, housed in FAR Subpart 16.6, reference the term "hourly rate."  *See* FAR 16.601(a) (defining "hourly rate" to mean "the rate(s) prescribed in the contract for payment for labor that meets the labor category qualifications of a labor category specified in

the contract"). FAR Subparts 16.2, 16.3, and 16.4, which detail the requirements for fixed-price, cost-reimbursement, and incentive contracts, respectively, never once reference "hourly rates." *See* FAR Subpart 16.2; FAR Subpart 16.3; FAR Subpart 16.4. Defendant's suggestion, therefore, that Plaintiffs have overemphasized the connection between the term "hourly rate" and labor hours misstates the realities apparent in the FAR, which the GSA itself administers.[33]

Indeed, Defendant's arguments regarding the inherent differences between "hourly rates" and labor hours are further belied by GSA's own statements regarding Class Deviation CD-2020-14. In Class Deviation CD-2020-14, GSA acknowledged the inherent connection between Section 3306(c)(3)'s requirements and time-and-materials and labor-hour contracts by "amending" the language in FAR Part 16.601(c) (which applies to both time-and-materials and labor-hour contracts) to reflect the exception in Section 3306(c)(3). *See* Class Deviation CD-2020-14 at 8; FAR 16.601(c); FAR 16.602 (confirming FAR 16.601(c) also applies to labor-hour contracts). Yet, the Class Deviation does not incorporate any changes to the FAR provisions for fixed-price, incentive, or cost-reimbursement contracts to accommodate Section 3306(c)(3). *See* Class Deviation CD-2020-14 at 5–8. Likewise, in Supplement 2, which approved the application of Class Deviation CD-2020-14 to the Polaris Solicitations, GSA repeatedly referenced a connection between labor hours and the language in Class Deviation CD-2020-14 (which, in turn, addresses the language in Section 3306(c)(3)). Supplement 2, AR at 2904. GSA stated it was approving the "use of Class Deviation 2020-14 authority for awarding *labor rates* with no stated price on the line item or sub-line item at the contract level for [the] 'Polaris Program' of [IDIQ] multiple-award

---

[33] *See supra* Background Section I; *Federal Acquisition Regulation (FAR),* U.S. General Services Administration, https://www.gsa.gov/policy-regulations/regulations/federal-acquisitionregulation -far (last visited Feb. 7, 2023) ("The Department of Defense (DoD), GSA, and the National Aeronautics and Space Administration (NASA) jointly issue the FAR.").

contracts." *Id.* (emphasis added). Additionally, GSA noted that Class Deviation CD-2020-14 "allowed for the use of *'unpriced labor' categories* at the contract level for certain IDIQ multiple-award contracts." *Id.* (emphasis added). Thus, the Government's insinuations that Plaintiffs pulled the connection between "hourly rates" and labor hours out of thin air is incorrect and conflicts with GSA's own statements regarding Section 3306(c)(3).

After considering the entire text and structure of 41 U.S.C. § 3306(c), relevant provisions from the FAR, and GSA's own prior interpretations of 41 U.S.C. § 3306(c)(3), this Court rejects Defendant's broad reading of 41 U.S.C. § 3306(c)(3) as unreasonable and contrary to law. Instead, this Court holds that "task or delivery orders based on hourly rates" references the time-and-materials and labor-hour contract types.

> **B.      The Polaris Solicitations Violate 41 U.S.C. § 3306(c)(3) Because They Do Not Adequately "Feature" Time-and-Materials and Labor-Hour Task Orders.**

Having confirmed the proper meaning of the term "based on hourly rates," this Court must now address whether the Polaris Solicitations conform to the requirement that procurements using the exception available under 41 U.S.C. § 3306(c)(3) must "*feature* individually competed task or delivery orders based on hourly rates." 41 U.S.C. § 3306(c)(3) (emphasis added). Section 3306(c)(3) permits procuring agencies to avoid evaluating price at the IDIQ level *only* if the IDIQ contracts issued under the procurement "*feature*" task orders "based on hourly rates," meaning time-and-materials and labor-hour task orders. *See* 41 U.S.C. § 3306(c)(3); *see also supra* Discussion Section III.A. The parties ultimately disagree on the degree to which procuring agencies must rely on time-and-materials and labor-hour task orders to take advantage of Section 3306(c)(3)'s exception. Defendant argues that even under Section 3306(c)(3), GSA has unfettered discretion to issue task orders using any of the contract types listed in the Polaris Solicitations. Cross-MJAR at 52–53, 58. Plaintiffs, however, assert that if GSA wants to apply Section

3306(c)(3) to the Polaris Solicitations, it may *only* issue time-and-materials and labor-hour task orders. *See* SHS MJAR at 36–37; VCH MJAR at 36–37 (same).  For the reasons discussed below, this Court concludes that the correct interpretation of "feature" as used in Section 3306(c)(3) lies between Plaintiffs' and Defendant's positions.

As Defendant argues all task orders contemplated under the Polaris Solicitations qualify as "task or delivery orders based on hourly rates," Defendant suggests it can exercise unfettered choice in selecting from among the Solicitations' stated contract types without running afoul of Section 3306(c). *See* AR at 2907 ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ (emphasis added).  Defendant contends that adopting such flexibility in crafting task orders is in the best interest of GSA "given the scope of IT-related services meant to fall under the $60 billion to $100 billion Polaris GWAC."  Cross-MJAR at 52–53 ("GSA reasonably determined that the IT work falling under the Polaris GWAC should not be limited to contracts whose *only payment structure* is based upon an hourly-rate assessment of service . . . but should instead include the possibility for multiple types of task orders, each of which would have a component in the payment structure that includes, *predominantly*, the payment of hourly-rate costs.") (emphasis in original); Oral Arg. Tr. at 79:19–21 ("[F]lexibility to be able to have costs considered at the task order level, I mean, it's critical for the Government . . . .").  In so doing, Defendant emphasizes the "broad authority" GSA's acquisition team has "in structuring a procurement solicitation," citing FAR 1.102(d) for such authority.  Cross-MJAR at 58; *see* FAR 1.102(d).

While this Court agrees that agencies have discretion in structuring procurement solicitations, that discretion is not unfettered.  As discussed above, Defendant has adopted an unreasonable interpretation of 41 U.S.C. § 3306(c)(3) that contradicts the statute's plain and unambiguous language.  *See supra* Discussion Section III.A.  While Defendant has offered several arguments for why such a reading of Section 3306(c)(3) serves the interests of the agency, "policy arguments do not trump the plain language of the statute."  *Dominion Res., Inc. v. United States*, 641 F.3d 1359, 1363 (Fed. Cir. 2011); *see Artuz v. Bennett*, 531 U.S. 4, 10 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them.").  Though it may bring added efficiencies or benefits to the agency to consider price at the task order level, rather than the IDIQ level, Defendant does not have free rein to disregard statutory requirements and limitations.  While the FAR grants agencies broad authority to structure solicitations in the best interest of the agency, the FAR cabins such authority, as it must, within the bounds of the law.  *See* FAR 1.102(d) ("In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR, *nor prohibited by law (statute or case law)*, *Executive order or other regulation*, that the strategy, practice, policy or procedure is a permissible exercise of authority.") (emphasis added).  Thus, Defendant cannot excuse its unreasonable interpretation of Section 3306(c)(3)'s plain language by relying on policy justifications, no matter how significant the procurement.

However, Plaintiffs' argument that the Solicitations may *only* contemplate time-and-materials and labor-hour contracts likewise conflicts with the plain language of 41 U.S.C. § 3306(c)(3).  Section 3306(c)(3) states that to refrain from considering price as an evaluation factor, the IDIQ contract must "*feature* individually competed task or delivery orders based on

hourly rates." 41 U.S.C. § 3306(c)(3) (emphasis added).  "Feature" is defined as "to give special prominence to; to have as a characteristic or feature; to play an important part." *Feature*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  Based on these definitions, and as Plaintiffs' counsel acknowledged during Oral Argument, the term "feature" does not describe a contract's sole requirements.  *See* Oral Arg. Tr. at 41:19–21 (responding to the Court's question on the meaning of "feature," Plaintiffs' counsel stated, "I don't believe it is everything").  Though neither party addressed the term "feature" in its briefing, during Oral Argument counsel for both parties interpreted the term "feature" to insinuate a concept of "predominance."  *See* Oral Arg. Tr. at 41:24–42:1 (Plaintiffs' Counsel: "I would say that [feature] would just have to be the predominant – the predominant requirement . . . ."); *id.* at 78:1–2 (Defendant's Counsel: "'[P]redominantly' would be an example of something featuring something.").  At Oral Argument, Defendant's counsel further suggested that "predominant" means a majority.  Oral Arg. Tr. at 78:16–17 ("I would say predominant means at least the majority.").

This Court considers the parties' interpretations of "feature" to be reasonable, given the plain meanings of both "feature" and "predominant."[34]  "Predominant" is defined as "being most frequent or common," and "predominantly" is defined as "for the most part; mainly." *Predominant*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *Predominantly*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003).  Said another way, something is "featured" if it is given "special prominence" or predominantly included among a group.  By requiring a contract to "feature" task orders "based on hourly rates," Congress did not intend that

---

[34] This interpretation is also consistent with the way in which the GSA interpreted Section 3306(c)(3) in Class Deviation CD-2020-14.  Class Deviation CD-2020-14 ¶ 5 ("To be eligible for consideration [for the application of the 41 U.S.C. § 3306(c)(3) exception] by the SPE, the *predominant* amount of the acquisition must be for services that will be acquired on an hourly rate basis.") (emphasis added).

the contract must *only* rely on task orders "based on hourly rates:" such task orders need only make up a featured, or predominant, portion of the task orders issued under the contract.[35]  Thus, the statute does not provide agencies unconstrained flexibility to choose among various contract types, as Defendant argues; however, the statute also does not demand complete inflexibility, as Plaintiffs suggest.

Going forward, GSA may proceed with its plan to apply 41 U.S.C. § 3306(c)(3) to the Polaris Solicitations but must do so in the manner Congress intended: by issuing IDIQ contracts that will feature time-and-materials and labor-hour task orders.  Based on what the parties have informed this Court about the goals and requirements of the Polaris Program, it is apparent that the Polaris Solicitations as currently drafted do not comply with Section 3306(c)(3).  In its request to apply Section 3306(c)(3) to the Polaris Solicitations, GSA stated that ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Supplement 2, AR at 2907–08.  Because GSA adopted an overly broad understanding of Section 3306(c)(3)'s scope, GSA stated the Solicitations will include a "full range of order types," "includ[ing] labor hour, time-and-materials, cost-reimbursement, and fixed-price type task orders."  *Id.* at 2907.  Thus, GSA's statements provide little clarity on the degree to which the

---

[35] Defendant argues that by including the terms "delivery order" and "cost" in 41 U.S.C. § 3306(c)(3), Congress intended that agencies could use contract types outside of labor-hour and time-and-materials contracts, contrary to Plaintiffs' position.  *See* Cross-MJAR at 56.  The inclusion of these terms in the statute is not inconsistent with Plaintiffs' interpretation that "based on hourly rates" references time-and-materials and labor-hour contracts.  Both "delivery order" and "cost" are used throughout FAR Subpart 16.6 to prescribe the requirements for time-and-materials and labor-hour contracts.  *See* FAR Subpart 16.6.  However, to the extent Defendant argues IDIQ contracts under Section 3306(c)(3) need not *solely* rely on time-and-materials and labor-hour contracts, such an argument is consistent with this Court's understanding of the statute. *See infra* Discussion Section III.B.

agency intends to favor time-and-materials or labor-hour task orders over the use of other contract types that are not "based on hourly rates."   Indeed, the limited evidence available to this Court suggests GSA's intent to do the opposite.  The terms of the Polaris Solicitations state a preference for "Firm-Fixed Price Performance-Based Task Order[s]," which are not properly conceived as "based on hourly rates."[36]  AR at 1025, 2064, 2554.  The Solicitations also allow task orders to combine various contract types into a single order comprising multiple contract line-item numbers (CLINs), but the Solicitations do not state how frequently time-and-materials or labor-hour CLINs will be used, if at all.  AR at 1025, 2064, 2554.  Thus, if GSA wishes to rely on Section 3306(c)(3) to avoid evaluating price at the IDIQ level, GSA must amend the Polaris Solicitations' terms to clearly feature time-and-materials and labor-hour task orders.

Alternatively, if GSA would prefer to maximize its discretion in selecting the type of task or delivery orders issued, GSA may choose to forego application of 41 U.S.C. § 3306(c)(3) entirely and evaluate price at the IDIQ level.  Oral Arg. Tr. at 79:2–5 (Court: "Well, [GSA doesn't] necessarily have to be locked into [certain contract types] if . . . the solicitation includes cost or price."  Defendant's Counsel: "[A]t the GWAC level, right.").  In originally drafting the Polaris Solicitations, Defendant rejected this approach.  Defendant has suggested that such an approach

---

[36] In stating a preference for firm-fixed price performance-based task orders, the Solicitations reference FAR 37.102(a)(2).  *See* AR at 1025, 2064, 2554.  This provision states that "[w]hen acquiring services . . . agencies must . . . [u]se performance-based acquisition methods to the maximum extent practicable" and "use the following order of precedence," listing firm-fixed price performance-based contracts as most preferred.  FAR 37.102(a) (citing Public Law 106-398, section 821(a), for its authority).  In other words, FAR 37.102(a) provides that generally, firm-fixed price performance-based contracts take precedence in acquisitions for services.  However, "[i]t is a commonplace of statutory construction that the specific governs the general."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  Through 41 U.S.C. § 3306(c)(3), Congress created a narrow exception to the general rules applying to acquisitions for services.  41 U.S.C. § 3306(c)(3).  Thus, for the narrow body of procurements covered in Section 3306(c)(3), Section 3306(c)(3), and not the general provisions in FAR 37.102, must govern.

would be unfeasible because it is too difficult for agencies and offerors to predict or ascertain price when preparing and reviewing proposals at the IDIQ level. *See, e.g.*, Oral Arg. Tr. at 79:7–23 ("[T]he problem with [evaluating price] at the GWAC level is . . . [y]ou don't know what the solicitation is going to be. . . . [Y]ou'd have people bidding on contracts that they didn't even know what they were going to be."). However, as Plaintiffs' counsel noted during Oral Argument, the government has issued several GWACs over the years which involve an evaluation of price at the government-wide contract level.[37] *See* Oral Arg. Tr. at 89:6–12 ("[T]here have been a number of government-wide acquisition contracts issued over the years . . . . [a]nd in almost all of those, the Government has actually evaluated pricing."). There is no evidence before this Court as to why it would be necessary to treat the Polaris Solicitations any differently. Further, as GSA identified in its request to apply Class Deviation CD-2020-14 to the Polaris Solicitations, ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ AR at 2908. Thus, by choosing to evaluate price at the IDIQ level, GSA could retain flexibility in selecting among contract types for task orders and renegotiate price at the task order level to minimize procurement costs for participating agencies.

This Court declines to prescribe the precise methods GSA must use to restructure its Polaris Solicitations. However, for the procurement to go forward, changes to the current Solicitations

---

[37] As just one example, the Alliant II GWAC for IT services required the agency to evaluate offerors' "maximum allowable labor rates" by labor category at the Master Contract level, which then would serve as rate ceilings for later task orders. *See* U.S. General Services Administration, *Alliant II Governmentwide Acquisition Contract (GWAC) – Ordering Guide Resource Library: Conformed Contract*, 20–22, https://www.gsa.gov/technology/technology-purchasing-programs/governmentwide-acquisition-contracts/alliant-2-governmentwide-acquisition-contract-gwac (last visited March 20, 2023).

must be made to align the Solicitations with federal procurement law.  FAR 1.102(d) grants agencies discretion to craft procurements in the best interests of the agency, so long as the selected procurement strategies operate within the bounds of the law.  FAR 1.102(d).  GSA must exercise its authority to redraft the Polaris Solicitations and clarify how the procurement intends to remain faithful to all requirements of 41 U.S.C. § 3306(c), as properly interpreted by this Court, and as consistent with this Memorandum and Order.  Until then, the Polaris Solicitations violate 41 U.S.C. § 3306(c)(3).

## IV.    Prejudice

To prevail in a bid protest, a challenger must also prove it suffered prejudice due to an error in the procurement process.  *See Glenn Def. Marine*, 720 F.3d at 912; *Am. Relocation Connections*, 789 F. App'x at 226–27.  Because this is a pre-award protest of the Polaris Solicitations, this Court is required to apply a less stringent prejudice standard than would ordinarily apply in a post-award bid protest.  *See Weeks Marine*, 575 F.3d at 1361–62.  Thus, Plaintiffs need only allege a "non-trivial competitive injury which can be addressed by judicial relief" to demonstrate prejudice.  *Id.* at 1359–63.  Another way of conceiving this standard is to ask whether the protestor has demonstrated "a greater-than insignificant-chance" that correcting the agency's errors could lead to a different result for the protestor in the procurement.  *Am. Relocation Connections*, 789 F. App'x at 228.  Under this less-exacting standard, the burden of demonstrating prejudice has been satisfied in this case.

Plaintiffs have alleged various forms of prejudice they will suffer should the Polaris Solicitations proceed as currently drafted.  First, Plaintiffs argue they have been prejudiced by GSA's decision to exclude Plaintiffs from bidding on the SB Pool Solicitation.  SHS MJAR at 20; VCH MJAR at 20.  However, because this Court agrees with GSA's decision to exclude Plaintiffs

based on a reasonable interpretation of 13 C.F.R. § 125.9(b)(3)(i), any prejudice Plaintiffs allege regarding their exclusion from bidding on the SB Pool Solicitation does not stem from an error in the procurement process. *See supra* Discussion Section I. Plaintiffs next allege they have experienced prejudice due to GSA's violations of 13 C.F.R. §§ 125.8(e), 127.506(f), and 125.18(b)(5). *See supra* Discussion Section II. Plaintiffs argue that if the Solicitations were "amended to comply with the regulations, Plaintiffs would be able to submit additional (or better) experience and obtain a higher score." SHS MJAR at 30; VCH MAR at 30; *see supra* Discussion Section II. Finally, Plaintiffs argue they have been prejudiced by Defendant's misinterpretation of 41 U.S.C. § 3306(c)(3) because Plaintiffs anticipate "their labor rates are going to be substantially lower than other labor rates," as has "been the case in other contracts [upon which] they have bid." Oral Arg. Tr. at 42:18–20. Plaintiffs also assert that, should this Court require the Polaris Solicitations to consider price at the IDIQ level, such an adjustment "adds a solicitation requirement that would necessarily change the overall structure of the evaluation" GSA must perform in awarding the IDIQ contracts. Oral Arg. Tr. at 43:3–5; *see supra* Discussion Section III. In both instances, Plaintiffs suggest that correcting GSA's errors in the Solicitations would place Plaintiffs in a better competitive position to secure an award under the Polaris Program, a complaint of prejudice that the Federal Circuit has acknowledged satisfies the "non-trivial competitive injury" test. *Am. Relocation Connections*, 789 F. App'x at 227–28.

Importantly, Defendant does not meaningfully contest the existence of prejudice for purposes of Plaintiffs' Motions. Defendant mentions the term "prejudice" only once in both its Cross-MJAR and Reply, noting in conclusory fashion that Plaintiffs "have not been prejudiced; thus no permanent injunction should be issued." Def. Reply at 24. In its Cross-MJAR, Defendant indicated that due to its belief in the strength of its case, it "do[es] not contest plaintiffs' argument

on any of the other injunction factors – irreparable injury, the balance of hardships, or the public interest." Cross-MJAR at 59. Defendant appears to contradict that statement almost immediately by alleging "Plaintiffs have not . . . established that they satisfy all of the elements necessary to obtain a permanent injunction." *Id.* at 59. Yet, Defendant does not clarify, substantively or otherwise, the way in which Plaintiffs have failed to demonstrate prejudice or irreparable harm. Indeed, when given the opportunity during Oral Argument to elaborate on its views regarding lack of prejudice, Defendant's counsel declined to offer the Court further argument on the subject. Oral Arg. Tr. at 90:21–91:9 (Court: "[I]f I agree with the Plaintiff[s] on at least one of these three arguments, do you agree that Plaintiff[s] ha[ve] sufficiently shown prejudice? . . . Or would you contest prejudice?" . . . Defendant's Counsel: "Your Honor, I would have to consult with the agency and look at the particulars of their particular prejudice in the context of whatever your ruling was, so I wouldn't want to make a blanket representation one way or the other.").

Given the arguments presented by Plaintiffs and Defendant's failure to meaningfully contest the existence of prejudice in this case, this Court deems Plaintiffs to have satisfied the lesser standard for prejudice applicable to this pre-award bid protest action. *See Weeks Marine*, 575 F.3d at 1361–62; *Am. Relocation Connections*, 789 F. App'x at 227–28.

**V.    Relief**

Plaintiffs seek to enjoin GSA from proceeding with the evaluation of proposals and subsequent award of IDIQ contracts under the current versions of the Polaris Solicitations. SHS MJAR at 40; VCH MJAR at 40. Under the Tucker Act, this Court has jurisdiction to award "any relief that the court considers proper, including . . . injunctive relief." 28 U.S.C. § 1491(b)(2). To award injunctive relief, a court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the

balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). Both parties agree that if Plaintiffs were to succeed on the merits, the appropriate remedy would involve injunctive relief designed to address the specific violations identified in the current Solicitations. *See, e.g.*, SHS MJAR at 40 (urging the Court to require GSA to either "amend or cancel and reissue the Solicitations consistent with law and regulation"); VCH MJAR at 40 (same); Pl. Reply at 25 ("[T]he Court should direct the Agency to publish Solicitations that comply with applicable law and regulation . . . ."); Cross-MJAR at 59–60 (acknowledging that "if the Court were to rule against [Defendant] on the merits, an injunction could be an appropriate remedy," but urging the Court to "narrowly tailor any injunctive relief so that GSA does not have to conduct an entirely new procurement or take steps not necessary to address the Court's concerns").

This Court agrees with the parties that an injunction is the appropriate remedy here. As noted, Plaintiffs have succeeded in proving the merits of their second and third claims. *See supra* Discussion Sections II and III. In addressing injunctive relief within the context of patent infringement, the Federal Circuit has acknowledged that a presumption of irreparable harm can apply to a party who clearly demonstrates a likelihood of success on the merits. *See Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[A] movant who clearly establishes the first factor receives the benefit of a presumption on the second [factor]."). As noted, Plaintiffs have demonstrated sufficient harm to warrant injunctive relief within the context of a pre-award bid protest. *See supra* Discussion Section IV. In contrast, Defendant has not alleged any harm that would result from this Court imposing injunctive relief and, on the contrary, acknowledges

that "an injunction could be an appropriate remedy."  Cross-MJAR at 59.  Further, compliance with relevant procurement law would not burden or harm the agency, as compliance with the law is a requirement of agency actors.  Thus, the balance of hardships in this protest favors the issuance of injunctive relief.  Finally, the public has a strong interest in ensuring government agencies structure procurements within the bounds of the law.  *See, e.g.*, *Transatlantic Lines, LLC v. United States*, 68 Fed. Cl. 48, 57 (2005) ("The public has a strong interest in [ensuring] that public officials treat contractors fairly and generally obey procurement laws and regulations.") (citations omitted).

For the foregoing reasons, this Court enjoins Defendant from evaluating proposals and awarding IDIQ contracts under the current versions of the Polaris SB, WOSB, and SDVOSB Pool Solicitations.  Throughout this Memorandum and Order, this Court has identified the aspects of these Solicitations that require revision by GSA to comply with the law, and similarly, this Court has highlighted various nonexclusive alternatives GSA may take to eliminate illegalities raised in this action.  Should it wish to proceed with the procurement, GSA may do so provided it amends the SB, WOSB, and SDVOSB Pool Solicitations in compliance and consistent with this Court's Memorandum and Order.

## CONCLUSION

For the reasons described above, this Court **GRANTS in part and DENIES in part** Plaintiffs' Motions for Judgment on the Administrative Record (ECF Nos. 33, 34) and **GRANTS in part and DENIES in part** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 37).  Defendant is **ENJOINED** from evaluating proposals and awarding IDIQ contracts under the current versions of the SB, WOSB, and SDVOSB Pool Solicitations.  To proceed with this procurement, Defendant must amend the SB, WOSB, and SDVOSB Pool

Solicitations, and evaluate proposals under those Solicitations, consistent with and in compliance with this Court's Memorandum and Order.  The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice within seven days, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

Dated: April 21, 2023
Washington, D.C.